**Lydia GRIFFIN, Shirretta Griffin, and Linda Trent, Plaintiffs,**

v.

**AMBIKA CORP., Aveda Corp., Estée Lauder, Aramis Inc., and Origins, Defendants.**

**No. 98 CIV. 8985(NRB).**

United States District Court, S.D. New York.

July 13, 2000.

---

Louis Ginsberg, Anthony Merlino, Law Firm of Louis Ginsberg, P.C., New York, NY, for Plaintiffs.

Ellen M. Martin, Patterson, Belknap, Webb & Tyler, L.L.P., New York, NY, for Defendants.

## OPINION AND ORDER

BUCHWALD, District Judge.

In this employment discrimination action, plaintiffs Lydia Griffin, Shirretta Griffin, and Linda Trent ("Trent") (collectively, "plaintiffs") allege that they were subjected to a racially hostile work environment and racial and retaliatory dismissal from their jobs at the Aveda West Broadway Salon ("the Salon") in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.;* the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 296 *et seq.;* and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq.* Plaintiffs have brought these claims against the corporate parents and affiliates of the Salon: Ambika Corporation ("Ambika"), Aveda Corporation ("Aveda"), Estée Lauder, and Aramis, Inc. ("Aramis") (collectively "defendants"). In addition, plaintiffs allege that defendants' actions violated their rights under 42 U.S.C. § 1981. Finally, Lydia Griffin also alleges that she was dismissed from a subsequent position at Origins Spa ("Origins"), another corporate affiliate of the defendants, in further retaliation for her complaints of the above-described discrimination. The parties have completed discovery and now pending is defendants' motion, pursuant to Fed.R.Civ.P. 56, for summary judgment. For the reasons set forth below, defendants' motion is granted.

## BACKGROUND

Except as noted, the following pertinent facts are either undisputed or construed most favorably to the plaintiff. The Salon is a privately-owned business that provides haircuts, massages, and beauty services in Manhattan. According to the defendants, the Salon is a subsidiary of Aramis, which operates salons in the New York area under the brand name "Aveda" and the Aveda Corporation is a separate corporate entity. Declaration of Lynn Oderwald, dated Dec. 15, 1999 ("Oderwald Dec.") ¶ 1; Plaintiffs' Counter 56.1 Statement ("Pl.56.1") ¶ 1. Both Aramis and Aveda are members of the "Estée Lauder Companies." Pl. 56.1 Ex. J.[1] Ambika was the previous owner of the Salon, but sold its interest in the "Aveda" brand name in December of 1997 and is not related to the Estée Lauder Companies. Oderwald Dec. ¶ 24.

Plaintiff Lydia Griffin "began her employment" at the Salon "on or about April 28, 1997, as a client coordinator." Comp. ¶ 12. Linda Trent was also hired as a client coordinator in June of 1997. *Id.* ¶ 14. Finally, Shirretta Griffin, who is Lydia Griffin's sister, was hired in the same capacity in September of 1997.[2] As client coordinators, plaintiffs "were responsible for booking services appointments for customers and for 'provid[ing] the utmost in customer service and proper scheduling' for external clients (*i.e.*, customers) and internal clients (*i.e.*, hairstylists and other employees who performed client services)". Def. 56.1 ¶ 2 (quoting Oderwald Dec. Ex. A); Pl. 56.1 ¶ 2. Among other requirements, the Salon's client coordinator job description lists the following "Basic Duties": "[p]ositive, interactive attitude with customers;" "[g]reet all clients in a professional manner;" and "[r]esolve client challenges if possible, if not, inform team leader." Oderwald Dec. Ex. A.

---

1. Part of defendants' motion for summary judgment requests that this Court find as a matter of law that Estée Lauder and Aveda are not proper defendants to this action because the Salon is not a subsidiary of, nor is it under the control or direction of, either company. Plaintiffs have provided some facial evidence to the contrary, *see* Pl. 56.1 Exs. I, J, and the plaintiffs themselves did receive notice of their eventual termination through letters printed on the letterhead of the Aveda Corporation. Oderwald Dec. Ex. O. However, plaintiffs have not submitted evidence from defendants' public filings or affidavits of anyone with personal knowledge of defendants' corporate structure. For the reasons discussed further *infra*, though, we need not formally adjudicate the corporate connections between defendants as it is not necessary to our determination that defendants are entitled to summary judgment on the substance of plaintiffs' claims.

2. Although plaintiffs' complaint lists Shirretta Griffin's hiring date as "on or about September 19, 1996," ¶ 13, this is apparently a typographical error in that plaintiff has not disputed the many references in defendants' submissions to all of the plaintiffs having been hired in 1997. *See, e.g.*, Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def.Mem.") at 2; Defendants' Statement Pursuant to Local Civil Rule 56.1(a) ("Def.56.1") ¶ 3; Pl. 56.1 ¶ 3.

Up until September of 1997, there was no on-site supervisor for the client coordinators at the Salon. Oderwald Dec. ¶ 2. However, this changed when Nancy McKay ("McKay") was transferred to the Salon on or about September 11, 1997 to serve in the capacity of "Retail Manager." Comp. ¶ 15; Declaration of Nancy McKay, dated De. 15, 1999 ("McKay Dec.") ¶ 1. In October of 1997, "Team Manager" Katherine Zolcinski ("Zolcinski") became plaintiffs' immediate supervisor. Comp. ¶ 16; Declaration of Katherine Zolcinski, dated Dec. 15, 1999 ("Zolcinski Dec.") ¶ 2.[3]

Plaintiffs maintain that McKay and Zolcinski were responsible for the alleged discrimination against them. Comp. ¶ 16; Deposition of Lydia Griffin, dated July 14, 1999 ("L. Griffin Dep.") p. 49; Deposition of Shirretta Griffin, dated July 15, 1999 ("S. Griffin Dep.") p. 82–83; Deposition of Linda Trent, dated July 22, 1999 ("Trent Dep.") p. 36–37. According to plaintiffs, this bias was initially revealed in October of 1997, when McKay referred to Lydia Griffin as a "street girl" or a "street person." L. Griffin Dep. p. 69; Trent Dep. p. 38. The exact circumstances of the incident, however, are unclear. L. Griffin Dep. p. 73. Similarly, plaintiffs accuse both McKay and Zolcinski of referring to them by using the phrase "you people." L. Griffin Dep. p. 99–101; S. Griffin Dep. p. 80–82. Again, plaintiffs' recounting of the circumstances under which McKay and Zolcinski used the phrase is unclear. *Id.* In one instance, an unnamed security guard allegedly quoted McKay to Shiretta

Griffin as using the phrase "you people, in terms of me [Shiretta Griffin], my sister [Lydia Griffin] and Linda Trent." S. Griffin Dep. p. 80. In addition, Linda Trent alleges that Zolcinski once accused plaintiffs and another black employee of intimidating customers and referred to them as a "gang." Trent Dep. at 41–42.

In October of 1997, an incident occurred between Lydia Griffin and another African–American employee of the Salon, Charlene Shaw ("Shaw"), who served in the capacity of assistant Team Manager. Declaration of Charlene Shaw, dated Dec. 14, 1999 ("Shaw Dec."), ¶ 3.[4] Although the exact details of the incident are in dispute, Pl. 56.1 ¶ 4, plaintiffs do not contest the fact that Shaw reported it to Lynn Oderwald ("Oderwald"), the Salon's Human Resources Representative, or that Shaw resigned shortly thereafter and gave as her reason the fact that "she could no longer tolerate the negative and uncomfortable environment created by Lydia Griffin and, to some degree, by her sister Shirretta." Def. 56.1 ¶ 4 (citing Shaw Dec. ¶¶ 3–4, Ex. A); Pl. 56.1 ¶ 4.

In November of 1997, another client coordinator at the Salon, Kris Scott ("Scott"), also resigned her position, reporting to Oderwald that Lydia and Shirretta Griffin were the reason for her resignation. Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.[5] Again, although the facts of Scott's interactions with plaintiffs are in dispute, plaintiffs do not contest that Scott reported that "she felt too intimidated by Lydia and Shirretta

---

**3.** Although the complaint refers to both McKay and Zolcinski as "Team Managers," we adopt their more precise titles for the purpose of this opinion inasmuch as it is irrelevant to the question of defendants' liability for their actions.

**4.** According to Shaw, during a meeting between herself, McKay, Lydia Griffin and others, Griffin interrupted something Shaw was saying and ordered her to "Be quiet! Ain't nobody talking to you." *Id.* Shaw said that when she continued to speak, Griffin "placed her full hand two or three inches in front of my face to shut me out of the conversation."

*Id.* Shaw signed a statement documenting the incident on October 16, 1997. *Id.*, Ex. A.

**5.** Scott reported to Oderwald several examples of "rude and aggressive behavior by Lydia Griffin toward co-workers." Oderwald Dec. ¶ 5. In particular, Scott related that Griffin had been "deliberately bumping into" Scott in the workplace and had accused Scott of being a "racist" because Scott had requested that Griffin turn down the volume of a radio on which Griffin had been playing gospel music. *Id.* Oderwald memorialized one of her conversations with Scott in a set of notes, dated November 18, 1997. *Id.* Ex. C.

Griffin to continue to work with them." *Id.*

Defendants also provide evidence of a series of complaints by four customers against Shirretta Griffin and Linda Trent between November of 1997 and February of 1998. Oderwald Dec. Ex. B.[6] In brief, defendants' documents accuse the plaintiffs of treating the customers rudely and cursing publicly. Plaintiffs admit only that a fifth customer, Tammy Devereaux, has ever complained about either Trent or Shirretta Griffin. Pl. 56.1 ¶ 6. However, they deny the substance of Ms. Devereaux's complaint. *Id.;* Affidavit of Linda Trent, dated Jan. 24, 2000 ("Trent Aff."), ¶¶ 2–4.

February 11, 1998, McKay prepared two "awareness letters" for Lydia Griffin. Oderwald Dec. Ex. D. To quote defendants' undisputed description of the letters, they "reported that Ms. Griffin, on two occasions, had used inappropriate language in front of customers." Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7. McKay further memorialized the incidents in an e-mail sent the same night to Oderwald and other employees of defendants. Oderwald Dec. Ex. E. "When Ms.

Griffin's supervisor and Ms. Oderwald met with Ms. Griffin to discuss the incidents and prepare her with the 'awareness letters,' Ms. Griffin denied the conduct and refused to sign the letters." Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.

Throughout late February and early March, another series of employees lodged complaints against the plaintiffs. Def. 56.1 ¶¶ 9–14, 17–18.[7] Again, plaintiffs summarily deny the substance of the complaints but do not dispute that the complaints were made. Pl. 56.1 ¶¶ 9–14, 17–18. One of the employees, hairstylist Richard Ruiz also expressed his desire to resign his position, giving as his reason the business he had lost "resulting from unprofessional client handling" by the plaintiffs. Oderwald Dec. Ex. H. Ruiz provided specific information about three of his best clients who had refused to return to the Salon because of behavior by the plaintiffs. *Id.* Among the incidents described by Ruiz was the complaint lodged by customer Tammy Devereaux, a complaint which plaintiffs admit Devereaux made. *Id.* Mr. Ruiz's account of events was memorialized in a contemporaneous e-mail. *Id.*[8]

**6.** For example, defendants produced two written statements by McKay, dated "November 30, 1997" and "December, 1997" reporting the details of separate complaints by two different customers against Linda Trent and McKay's subsequent conversations with Trent about the incidents. Oderwald Dec. Ex. B. Zolcinski has submitted a similar statement about an incident between yet a third customer and Shirretta Griffin "on or around December 19th." *Id.* Defendants have also produced a "1st Written Warning" dated February 13, 1998, setting forth in detail a fourth customer's complaint of rudeness by Shirretta Griffin and an employee's follow-up conversation with Griffin. Again, plaintiffs' only response is a summary denial that either the rudeness or the responsive conversation ever occurred. Pl. 56.1 ¶ 6; S. Griffin Dep. p. 65.

**7.** Hairstylist Patrick Coombs submitted a written statement via e-mail that, among other things, accused Lydia Griffin of using "foul language" in front of customers and threatening a co-worker, "don't make me mad, don't piss me off ... cuz [sic] I control your book. I can make you or break you." Oderwald

Dec. Ex. F. Another co-worker submitted a hand-written memorandum, dated February 12, 1998, to Oderwald reporting that all three plaintiffs had repeatedly used loud and profane language in front of customers and made the customers "upset." *Id.* Ex. G. The employee asked Oderwald that she remain anonymous "since both Lydia and Shirretta can make my work less profitable by not scheduling appointments for me when they are upset." *Id.* Hairstylist Shane Manieri provided a hand-written March 10, 1999 memorandum detailing what he described as "rude, mean and very prejudice[d]" behavior by Lydia and Shirretta Griffin. Oderwald Dec. Ex. J. Manieri also reported that yet another customer had complained about Shirretta Griffin's rudeness. *Id.*

**8.** Plaintiffs acknowledge that on or about March 4, 1998, Zolcinski "accused plaintiffs of being rude to a customer." Comp. ¶ 17. However, plaintiffs allege that the accusation was false and that "a white/Caucasian employee was not accused, even though a complaint about [that] employee was made." *Id.* Plaintiffs have not provided any further detail

The most serious charges against the plaintiffs were those by a new client coordinator, Azita Sabahi ("Sabahi"). On March 6, Sabahi reported to Oderwald that she felt she was being subjected to a hostile work environment created by the plaintiffs. Def. 56.1 ¶ 14. Specifically, Sabahi alleged that plaintiffs had made disparaging and discriminatory remarks about her because of her Iranian national origin.[9] *Id.* Oderwald documented the conversation in a March 6 e-mail which she sent to Thomas Pflepsen ("Pflepsen"), a senior human resources manager with Aramis. Oderwald Dec. ¶ 10, Ex. I. Sabahi then created a written record of her allegations against the plaintiffs, which she signed on March 17. Sabahi Dec. Ex. A. Although plaintiffs again summarily deny the substance of Sabahi's accusations, they acknowledge that she did make them and that she produced her own written document. Pl. 56.1 ¶¶ 14–15; S. Griffin Dep. p. 93.

Shortly after Pflepsen received Oderwald's report of Sabahi's complaints, he made a determination that there "was a sufficiently corroborated record on which to initiate action." Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16. Pflepsen, Oderwald and Aramis general manager Stefany Reed ("Reed") "agreed that it was critical that they proceed with any final investigation and appropriate disciplinary action as soon as Ms. Sabahi submitted her written account." *Id.* Plaintiffs claim that they were completely unaware of any of these complaints and that, to the contrary, while visiting the

Salon, general manager Reed had praised Lydia Griffin and Linda Trent as "great employees," on March 3, 1998. Pl. 56.1 second set of numbered paragraphs ("2d¶") 7.[10]

At the same time, plaintiffs claim that McKay's and Zolcinski's discriminatory attitudes are proven by a series of false accusations that the supervisors allegedly made against the plaintiffs. Specifically, Shirretta Griffin alleges that McKay falsely accused her of making an expensive telephone call on the Salon's phone at some unspecified time. S. Griffin Dep. p. 82. Similarly, Trent alleges that, at other unspecified times, McKay had implied that one of the plaintiffs had been responsible for a shortfall in a cash register, and that one of them had placed an unauthorized photograph of Al Sharpton on the bulletin board that the Salon uses to inform customers of the company's sales and services. Trent Dep. at 40–41. Finally, Trent alleges that McKay implicitly accused her of stealing one of her co-worker's tips when McKay told the co-worker that she had a right to feel upset about the missing tip. *Id.* at 43–44. Plaintiffs have also provided supporting affidavits by two other African–American former employees of the salon, who accuse McKay of using a "negative tone of voice" with black employees, Affidavit of Anthony Williams, dated Oct. 29, 1999, ¶ 4, and of creating false charges against them to get them discharged. *Id.* ¶ 5; Affidavit of Tomonkia

---

about the circumstances of this incident or the identity of the "white/Caucasian employee."

9. Sabahi accused the plaintiffs of making repeated, specific comments referring to her Iranian heritage. For example, at varying times each of the plaintiffs allegedly made comments to that effect that, because of her Iranian heritage, Sabahi could have placed a bomb in the Salon, that she "smells funny," that she had some kind of foreign matter in her hair, or that she had spread the disease anthrax or other infections. Declaration of Azita Sabahi, dated Dec. 14, 1999 ("Sabahi Dec.") Ex. A. At other times plaintiffs alleged-

ly ignored Sabahi or stood in her way, physically preventing her from doing her work. *Id.* In addition, Sabahi reported that Lydia Griffin referred to others in the Salon as "Fucking Faggots," "Bitches," or "Lesbians" of whom Griffin was "sick and tired." *Id.*

10. Defendants have provided copies of e-mails from Reed to Oderwald and Pflepsen, dated March 5, 1998, in which Reed expresses frustration with the fact that Zolcinski had not shared with her the extent of the employee conflict and complaints at the Salon. Oderwald Dec. Ex. Q.

Byrd, dated Oct. 27, 1999, ¶¶ 3–4.[11]

Although the exact timing is unclear, plaintiffs allege that they first complained about this discrimination to both Zolcinski and Oderwald. However, on March 10, 1998, Lydia Griffin filed a formal complaint with the New York State Division of Human Rights ("NYSDHR"), alleging that she and other black employees of the Salon had been subjected to race and color discrimination. Def. 56.1 2d¶ 2; Oderwald Dec. Ex. P. In it, Griffin recited that she "and my black counterparts [had] got[ten] along well with Ms. Zolcinski,"[12] but that once "McKay came to the department, Ms. McKay and Ms. Zolcinski began treating Black employees in a discriminatory manner." Oderwald Dec. Ex. P. Griffin also listed her allegations that McKay had called her a "street person," used the phrase, "you people" and made false accusations against black employees "while failing to make the same accusations against similarly situated Caucasian employees." *Id.* Defendants received notice of the complaint on March 17, 1998, when a copy of it was delivered to the Salon by mail. Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27, 2d¶ 3.[13]

On March 19, 1998, Oderwald and Reed met with all three plaintiffs to inform them that they would be placed on a paid break. Pl. 56.1 2d¶ 4; Oderwald Dec. ¶ 13. *See also* Oderwald Dec. Ex. K (a March 19, 1998 e-mail memorializing the meetings with plaintiffs). During the following week, Oderwald, Reed, and Pflepsen conducted five more employee interviews to investigate the complaints about the plaintiffs. Oderwald Dec. ¶ 14. *See also id.,* Ex. L. (a March 23, 1998 e-mail listing the questions asked in the interviews). Reed and Oderwald again met with each of the plaintiffs individually on March 25, 1998, but none of the three provided evidence to refute the charges against them. Oderwald Dec. ¶ 15, Ex. N; Pl. 56.1 ¶¶ 21, 22.

On March 26, Oderwald sent individual letters to each of the plaintiffs informing them that their employment had been terminated. Pl. 56.1 2d¶ 5; Oderwald Dec. Ex. O. The letters confirmed for the plaintiffs the Salon's position that it had received complaints from a number of their co-workers and customers concerning their "unprofessional behavior" and "business conduct" and stated that the company had "no alternative" but to fire the plaintiffs "due to the needs of our business." Oderwald Dec. Ex. O. The Salon enclosed checks for each of the plaintiffs for the days they had been placed on paid leave and for unused vacation time. *Id.* In total, Lydia Griffin was employed at the Salon for eleven months, Trent for nine months, and Shirretta Griffin for seven months. Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.

Subsequently, both Shirretta Griffin and Linda Trent filed formal complaints with the Equal Employment Opportunity Com-

---

**11.** Plaintiffs also allege that three other employees of the Salon complained of discriminatory treatment. *See* Pl. Mem. at 17; L. Griffin Dep. at 75–76. However, plaintiffs have been unable to provide specifics as to all the names of these alleged complainants or the times or contexts under which their alleged complaints were made. Given the unsworn, out-of-court nature of these purported complaints, they are either excludable hearsay or the product of mere conclusory allegations. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 447 (2d Cir.1999) (affirming that even for summary judgment purposes, plaintiff's evidence must be admissible) *cert. denied,* —— U.S. ——, 120 S.Ct. 2688, —— L.Ed.2d —— (2000); *Barua v. Credit Lyonnais–U.S. Branches,* No. 97 Civ. 7991, 1998 WL 915892, *4 (S.D.N.Y. Dec. 30, 1998)

(granting summary judgment where "much of plaintiff's proffered 'evidence' is either inadmissible hearsay or so conclusory as to satisfy the requirements of [Federal] Rule [of Civil Procedure] 56(e).").

**12.** At her July 14, 1999 deposition, Lydia Griffin denied that she had ever "said that I got along with" Zolcinski, until she was presented with a copy of the NYSDHR complaint. L. Griffin Dep. at 47.

**13.** Linda Trent also filed a complaint with the NYSDHR on the same day, Pl. 56.1 2d¶ 2, but withdrew it in a written communication to the NYSDHR the following day. Declaration of Ellen M. Martin, dated Dec. 15, 1999 ("Martin Dec."), Ex. E.

mission. Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28. The Salon did not receive notice of Trent's formal complaint until April 8, 1998, and did not receive notice of Shirretta Griffin's until June of 1998. *Id.* Following plaintiffs' termination, the Salon hired three individuals to replace them as client coordinators, each of whom was black. Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24. All three were employed at the Salon, under the supervision of Zolcinski and McKay, for approximately two years "without incident." Oderwald Dec. ¶ 17; Zolcinski Dec. ¶ 11. Two of these replacements continue to work at the Salon under Zolcinski's supervision. *Id.*

On May 5, 1998, Lydia Griffin applied for the position of Front Desk Manager at Origins, another salon located at Chelsea Piers in Manhattan. Def. 56.1 ¶ 25; Pl. 56.1 ¶ 25; L. Griffin Dep. at 178–182. In connection with that application, Griffin filled out and signed a form in which Griffin listed, among other things, her employment history. Declaration of Patrick Bruner, dated Dec. 14, 1999 ("Bruner Dec.") Ex. A. Above the signature, the form clearly indicates, "[m]isrepresentation or omission of information listed in this application is cause for dismissal." Yet, under her employment history, Griffin reported that she had been employed at the Salon from April 1997 to April 1998, and that her "reason for leaving" was "the company's communication [sic] for growth was unable to be met and I needed more responsibiliti [sic] to help achieve the goals of the [indecipherable]." Griffin contends that this was not a lie, Affidavit of Lydia Griffin, dated Jan. 25, 2000 ("L. Griffin Aff.") ¶ 6, and that, at her interview, she "discussed the incident that happened with myself and Nancy McKay and the results of that" with Origins manager Patrick Bruner ("Bruner"), including the circumstances of her termination. L. Griffin Dep. at 182–85. *See also* L. Griffin Aff. ¶ 6.[14]

Griffin was offered a position at Origins and began working shortly thereafter. Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26. However, she was terminated from her employment May 21, 1998, by "Judy Stewart from [Origins'] Human Resources [department], who had no part in my hiring." L. Griffin Dep. ¶ 7. According to Bruner, Griffin was fired because managers at Origins had subsequently learned of the serious nature of the charges against her by the Salon, and because of the misrepresentation and/or omission in her employment application. Bruner Dec. ¶ 5. In response, Griffin alleges that because Origins is affiliated with Estée Lauder, and because Bruner would not corroborate her version of events, that she "believe[s]" that Origins "found out that [she] filed a discrimination complaint" and fired her. L. Griffin Aff. ¶ 8.

Plaintiffs filed this action December 12, 1998. After extensive discovery, defendants filed the instant motion on February 4, 2000.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is properly granted " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.' " *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

---

**14.** Bruner has signed a sworn declaration, stating that Griffin neither told him that she had been terminated, nor that it was the result of an investigation of complaints from co-workers. Bruner Dec. ¶¶ 3–4.

In reviewing the record, we must assess the evidence "in the light most favorable to the non-movant and ... draw all reasonable inferences in [her] favor." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990). The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment. In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (internal quotation omitted).

In considering this summary judgment motion, we are mindful that summary judgment is "ordinarily inappropriate" in the context of a workplace discrimination case because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision. *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir.1984). "Employers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law." *Bickerstaff*, 196 F.3d at 448 (citation omitted).

At the same time, the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *McLee v. Chrysler Corp.* (*"McLee I "*), 38 F.3d 67, 68 (2d Cir.1994). Plaintiff is not absolved of the responsibility of producing sufficient evidence from which a reasonable juror could return a verdict in her favor. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (finding that mere speculation or conjecture as to the true nature of the facts cannot overcome a motion for summary judgment); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases"); *Ricks v. Conde Nast Publications, Inc.*, 92 F.Supp.2d 338, 343–44 (S.D.N.Y.2000) (same).

## II. Plaintiffs' Claims

### A. Race Discrimination

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the United States Supreme Court articulated a three-step burden shifting analysis which courts must apply when analyzing discrimination claims. This analysis was recently revisited by the Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, —— U.S. ——, 120 S.Ct. 2097, 2105–06, 147 L.Ed.2d 105 (2000). First, the plaintiff must establish a *prima facie* case of discrimination, *see McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817, by showing (1) "membership in a protected class," (2) "qualification for the position [held]," (3) "adverse employment action," and (4) "circumstances giving rise to an inference of discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir.2000). *See also Reeves*, 120 S.Ct. at 2105–06. Once a plaintiff successfully makes out a *prima facie* case, the law creates a presumption that the employer unlawfully discriminated against the plaintiff. *See Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997).[15]

The burden then shifts to the employer to articulate a legitimate, nondiscrimina-

---

**15.** "Our consideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims." *Cruz*, 202 F.3d at 565, n. 1 (citing *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264, n. 1 (2d Cir.1999); *Landwehr v. Grey Adver., Inc.*, 211 A.D.2d 583, 622 N.Y.S.2d 17 (1st Dep't 1995)). *See also Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir.1996).

ry reason for the employment decision. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Cruz,* 202 F.3d at 567. As the Supreme Court recently noted, "[t]his burden is one of production, not persuasion." *Reeves,* 120 S.Ct. at 2106. "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the *prima facie* case. The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Fisher,* 114 F.3d at 1335–36 (citation omitted).

If the defendant is able to provide evidence of a nondiscriminatory basis for the discharge, then the presumption of discrimination "simply drops out of the picture" and the burden once again shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's presumptively valid explanation was merely a pretext for discrimination. *Reeves,* 120 S.Ct. at 2105–06 (citing, *inter alia, St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). *See also McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. However, a trier of fact "may [still] consider the evidence establishing the plaintiff's *prima facie* case 'and the inferences properly drawn therefrom.'" *Reeves,* 120 S.Ct. at 2106 (quoting *Burdine,* 450 U.S. at 255, n. 10, 101 S.Ct. 1089).

The "ultimate issue" in any employment discrimination case is whether the adverse employment decision was motivated at least in part by a discriminatory or retaliatory reason. *See Fields v. New York State Office of Mental Retardation and Dev. Disabilities,* 115 F.3d 116, 119 (2d Cir. 1997); *Lapsley v. Columbia University–College of Physicians and Surgeons,* 999 F.Supp. 506, 513 (S.D.N.Y.1998). Despite the initial evidentiary burden shifting,

"[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves,* 120 S.Ct. at 2106 (quoting, *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). "And in attempting to satisfy this burden, the plaintiff ... must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *St. Mary's,* 509 U.S. at 507–08, 113 S.Ct. 2742). In the summary judgment context, the "central question" is whether plaintiffs have "presented sufficient admissible evidence from which a rational finder of fact could infer that more likely than not [that they were] the victim[s] of intentional discrimination," *i.e.,* that an impermissible reason played a determinative role in the adverse decision. *See Bickerstaff,* 196 F.3d at 447.

The burden of establishing a *prima facie* case has generally been considered minimal by the Second Circuit. *See Tarshis v. Riese Org.,* 211 F.3d 30 (2d Cir.2000). Moreover, the Supreme Court's recent decision in *Reeves,* 120 S.Ct. at 2106, eliminates any potential distinction between evidence plaintiff uses to meet its *prima facie* burden of showing "circumstances giving rise to an inference of discrimination," and evidence plaintiff uses to meet its burden of showing that defendants' stated reason for their firings is a pretext for discrimination. As a result, we assume that plaintiff has met this minimal burden for the purpose of this motion. *See, e.g., Cruz,* 202 F.3d at 567; *Velasquez v. Goldwater Mem'l Hosp.,* 88 F.Supp.2d 257, 261 (S.D.N.Y.2000); *Watt v. New York Botanical Garden,* No. 98 Civ. 1095, 2000 WL 193626, *5 (S.D.N.Y. Feb. 16, 2000).[16]

---

**16.** We emphasize, though, that we make no finding that plaintiffs have met even their *prima facie* burden. Plaintiff must still offer some evidence from which a reasonable factfinder could conclude that they were qualified for their positions as client coordinators. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct.

1817; *Thornley v. Penton Publ'g,* 104 F.3d 26, 29 (2d Cir.1997). Where defendants have produced "substantial uncontradicted evidence that [plaintiff's] work was substandard," courts have held that plaintiff failed to meet his or her *prima facie* burden. *See, e.g., Sutherland v. New York State Dep't of Law,*

**308**

■ Accordingly, the burden shifts to defendants to present a permissible reason for plaintiffs' firing. Defendants attempt to meet this burden by "articulat[ing]" and "provid[ing] compelling proof" of its reason, the company's "conclusion—based on multiple strikingly similar reports—that plaintiffs had engaged in rude, threatening and discriminatory conduct toward co-workers and rude behavior toward customers." Def. Mem. at 14. Given the low threshold that defendants must meet, there can be no doubt that the many complaints lodged against plaintiffs for poor performance constitute sufficient legitimate grounds to shift the burden back to plaintiffs to make their ultimate case. *See Hollander v. American Cyanamid Co.,* 172 F.3d 192, 199–200 (2d Cir.1999) (finding a consistently documented record of interpersonal problems to satisfy a defendant's burden of producing a non-discriminatory motive); *McLee v. Chrysler Corp. ("McLee II ")*, 109 F.3d 130, 135 (2d Cir.1997) (finding unsatisfactory performance to be a "race-neutral" reason for termination).

■ In particular, the allegations that plaintiffs themselves engaged in discriminatory conduct provide ample reason for dismissal given the strength of the very discrimination laws of which plaintiffs now avail themselves. Even if Sabahi's complaints later proved to be untrue, it is within an employer's right to limit its own liability for discrimination suits by removing an employee it suspects of engaging in discriminatory conduct. *See Shepard v. Frontier Communications Servs.,* 92 F.Supp.2d 279, 293 (S.D.N.Y.2000) (finding that even if the allegations against plaintiff proved to be untrue, they still provided a permissible basis for firing plaintiff).

■ As a result, the focus again shifts to plaintiffs to determine whether they have provided evidence sufficient to meet their "ultimate burden" of showing that defendants' purported rationale was actually pretext for intentional discrimination. Plaintiffs attempt to show pretext mainly by repeating their allegation that they performed their jobs in a satisfactory manner and that they dispute the contents of the many complaints against them. However, a plaintiff's personal belief that she was qualified for a position is insufficient to demonstrate that an adverse action was discriminatory. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129–30 (2d Cir. 1996).

Here, plaintiffs provide almost no detail that might lead a reasonable trier of fact to an alternate explanation of the complaints against them, nor do they provide any evidence of their own job qualifications beyond their own conclusory allegations. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff,* 196 F.3d at 451–52 (restating principle that to defeat summary judgment, plaintiffs', "affidavits must be based upon concrete particulars, not conclusory allegations") (citing, *inter alia, BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996)). *See also Ricks,* 92 F.Supp.2d at 346–47 (basing grant of summary judgment for defendant in Title VII case, in part, on plaintiff's reliance on conclusory allegations to rebut defendants' specific evidence).

We note in particular that plaintiffs have not provided, in either affidavit or unsworn letter form, evidence from any other co-

No. 96 Civ. 6935, 1999 WL 314186, *9 (S.D.N.Y. May 19, 1999) *aff'd* 2000 WL 730413, *2 (2d Cir. June 2, 2000). In addition, for the reasons discussed in greater detail *infra,* it is not clear that plaintiffs have produced sufficient evidence to support a finding of "circumstances giving rise to an inference of discrimination." *See, e.g., Dew v. Health Ins. Plan of Greater New York,* No. 97

Civ. 7006, 1999 WL 684158, *5–6 (E.D.N.Y. July 15, 1999) (finding plaintiff unable to make out a *prima facie* case where the evidence presented "preclud[ed] any rational inference that discrimination played any part in [defendant's] decision to terminate [the plaintiff]") *aff'd* 208 F.3d 202, 2000 WL 282488, *3 (2d Cir. Mar. 14, 2000).

worker or former employer that contradicts defendants' assessment of plaintiffs' poor performance. As Judge Sotomayor has noted, the Second Circuit requires that the plaintiff "show that he or she 'shows satisfactory job performance at the time of discharge.'" *Hawkins v. Astor Home for Children*, No. 96 Civ. 8788, 1998 WL 142134, \*4 (S.D.N.Y. Mar. 25, 1998) (quoting *Thornley*, 104 F.3d at 29). Even the two affidavits of former co-workers plaintiffs have provided do not attest to plaintiffs' qualification for or competence in the job of client coordinator. "The mere fact that an employee disagrees with her employer's assessment of her work ... cannot standing on its own show that her employer's asserted reason for termination was pretextual." *Ricks*, 92 F.Supp.2d at 347 (citing *Taylor v. Polygram Records*, No. 94 Civ. 7689, 1999 WL 124456, \*10 (S.D.N.Y. Mar. 8, 1999)).

Although plaintiffs do not specifically make this argument in their briefs, they implicitly attempt to show that their termination was the result of pretext through their allegations of "racist comments," "false accusations," and the "hostile disposition directed toward them by Nancy McKay and Katherine Zolcinski." Pl. Mem. at 16 (describing plaintiffs' hostile work environment claim, discussed *infra*). *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir.1995) ("[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.").

However, it is fatal to plaintiffs' case that they only allege that McKay and Zolcinski, and not any of the decision-makers who were responsible for their termination harbored discriminatory feelings for them. Under repeated questioning at their depositions all three plaintiffs took the unilateral position that no one other than McKay and Zolcinski "ever discriminated against [them] based on [their] race." L. Griffin

Dep. at 49. *See also* S. Griffin Dep. at 83; Trent Dep. at 37. As such, plaintiffs cannot allege that the decision by Oderwald, Reed, and Pflepsen to fire them was based on a racially discriminatory motive. Even if we discount all the complaints made or recorded by McKay and Zolcinski, that would still leave six additional complaints against both of the Griffin sisters and three additional complaints against Trent. *See, e.g., Shepard*, 92 F.Supp.2d at 293 (finding no evidence of pretext where, even though alleged harasser "precipitated the investigation of plaintiff's work performance," he was "not responsible for supplying" "the information relied on" in management's determination to terminate plaintiff). Plaintiffs' "feeling" that McKay and Zolcinski did not treat them fairly is therefore insufficient to create an inference that the senior management of the Salon acted in a discriminatory manner.

Moreover, to the extent that plaintiffs base their claim of racially discriminatory firing on Lydia Griffin's allegations of disparate treatment, plaintiffs have not proffered sufficient evidence to support such an inference. In her complaint to the NYSDHR, Griffin stated that McKay and Zolcinski made false accusations against black employees "while failing to make the same accusations against similarly situated Caucasian employees." Oderwald Dec. Ex. P. However, plaintiffs have not provided any specifics whatsoever about white employees who were treated in a preferential way. *See Cruse v. G & J USA Publ'g*, 96 F.Supp.2d 320, 330 (S.D.N.Y.2000) (granting summary judgment where plaintiff had not "offered sufficient evidence that a similarly situated Caucasian employee was treated differently"). Without any frame of reference for comparison, let alone any corroborating or verifying evidence of disparately treated incidents, such an amorphous claim cannot stand on the basis of mere conclusory allegations that plaintiffs were treated differently. *See, e.g., Cruz*, 202 F.3d at 568; *Bickerstaff*, 196 F.3d at 451–52; *Ricks*, 92

F.Supp.2d at 346–47. *See also McCarthy v. New York City Technical College of C.U.N.Y.*, 202 F.3d 161, 165 (2d Cir.2000) (finding that a statistical "sample" of two was "clearly 'insufficient to sustain a reasonable inference'" of discrimination) (quoting *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 121 (2d Cir.1997)).

Plaintiffs argue that the Supreme Court's recent decision in *Reeves*, 120 S.Ct. 2097, mandates a finding that "that plaintiffs have shown issues of fact that defendants' reasons for terminating them were false." Letter of Anthony Merlino, dated June 14, 2000. However, plaintiffs read too much into *Reeves*. In that case, the Court held that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* 120 S.Ct. at 2109. Although the *Reeves* holding does overrule the Second Circuit's so-called "pretext plus" requirement, *see id.* at 2104–05, the Court did not eliminate the more fundamental requirement that plaintiff actually proffer "sufficient evidence" that the "justification is false." *Id.* at 2109. Here, for the reasons discussed *supra*, plaintiff has not proffered such "sufficient evidence."

Above and beyond plaintiffs' inability to allege facts sufficient to support an inference that the justification for their firing was pretextual, defendants have produced copious contemporaneous evidence documenting plaintiffs' history of disciplinary problems and other differences with supervisors and co-workers. In the face of defendants' well-documented record of plaintiffs' misbehavior, plaintiffs offer only conclusory allegations. Given this disparity, we conclude that no reasonable jury could find in favor of the plaintiffs, *i.e.*, that their firing was the result of unlawful discrimination. *See McLee II*, 109 F.3d at 135 (affirming summary judgment where the record "establishes indisputably that,

for race-neutral reasons, [plaintiff's] performance was not satisfactory"); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994) ("When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight ... a grant of summary judgment is proper."); *Watt*, 2000 WL 193626, at *6 (granting summary judgment where plaintiff failed to meet the "'formidable task in endeavoring to show that the asserted reason' for her termination was false and that the [defendant]'s motivation was discriminatory" where defendant had offered an "abundance of evidence presented by in support of its motion") (quoting *Lieberman v. Gant*, 630 F.2d 60, 66 (2d Cir.1980)).

"As a jury would be entitled to review the evidence as a whole, courts must not view the evidence in a piecemeal fashion in determining whether there is a trial-worthy issue." *Bickerstaff*, 196 F.3d at 448 (citing *Danzer v. Norden Sys.; Inc.*, 151 F.3d 50, 57 (2d Cir.1998); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir.1997)). Where plaintiffs fail to rebut specific, credible evidence offered in support of an employer's articulated reason for their firing, they cannot maintain claims that their firings were discriminatory. *See, e.g., Bickerstaff*, 196 F.3d at 451–52; *Ricks*, 92 F.Supp.2d at 346–47; *Dew*, 1999 WL 684158 at *7 *aff'd* 2000 WL 282488, at *3; *Sutherland*, 1999 WL 314186 at *9–10, *aff'd* 2000 WL 730413 at *3.

Plaintiffs argue that the evidence against them is unreliable in light of their allegation that they were not told of the vast majority of the complaints. Plaintiffs also cling to a compliment paid them by Reed, Aramis' general manager who visited the Salon in early March. However, this one compliment cannot overcome the volumes of documented complaints from those who worked alongside plaintiffs on a daily basis.[17] Moreover, "the fact that an

---

17. Also, defendants have explained that Reed

was only an occasional visitor to the Salon

employee was unaware of [her] employer's dissatisfaction is irrelevant to a court's inquiry on the issue." *Thermidor v. Beth Israel Med. Ctr.*, 683 F.Supp. 403, 413 (S.D.N.Y.1988) (citing *Huhn v. Koehring*, 718 F.2d 239, 244 (7th Cir.1983)).

In order for a jury to find in favor of the plaintiffs, that jury would necessarily need to conclude that all five of the former and present employees of the Salon who signed and/or swore to statements complaining about plaintiffs' behavior, and their three supervisors who evaluated these complaints, lied in defense of McKay and Zolcinski's alleged discrimination. This conclusion would require guesswork or theorizing, which do not amount to permissible "inferences" in Title VII or any other cases. *See Bickerstaff*, 196 F.3d at 448 (citing 1 Leonard B. Sand, et al., *Modern Federal Jury Instructions* ¶ 6.01, instr. 6–1 (1997)); *Repp v. Webber*, 132 F.3d 882, 889–90 (2d Cir.1997) (reciting the Supreme Court's teaching that there is no "genuine" issue of material fact where it cannot be said 'that the evidence would allow a reasonable jury to find in favor of the non-moving party' ") (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505); *Watt*, 2000 WL 193626, at *7 (entering summary judgment in a discrimination case where "to make the inferential leap that plaintiff would like requires not one inference, but a stacking of two inferences").

Finally, plaintiffs must also overcome the fact that they have produced no evidence to contest defendants' sworn assertion that plaintiffs were replaced by members of the same racial minority without any subsequent problem. The obvious inference is that discrimination was not a motivating factor in plaintiffs' termination. To overcome this inference, plaintiffs must introduce evidence that their replacements were hired as a means of insulating defendants from liability. *See McCarthy*, 202

and that she paid the compliment during a time when she was unaware of the extent of the personnel troubles. *See* Oderwald Dec. Ex. Q (a contemporaneous e-mail in which

F.3d at 165. Plaintiffs' have not produced any such evidence. *See Brady v. KBI Security Serv., Inc.*, 91 F.Supp.2d 504, 508–09 (E.D.N.Y.2000) (finding that plaintiffs's "assertions of racial discrimination lack force in light of" the fact "that each of the plaintiffs was replaced by an African-American, the same protected racial class as plaintiffs"). As a result, summary judgment must be entered in favor of the defendants on plaintiffs' claims of racially discriminatory termination.

**B.  Retaliation Claims against the Salon**

Title VII also provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [such employee] has opposed any practice made an unlawful practice by this subchapter...." 42 U.S.C. § 2000e–3(a). As the Second Circuit has noted, "[t]he objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).

We evaluate retaliation claims under the same burden shifting rules as used in race discrimination cases under *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. *See Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 443 (2d Cir.1999). A *prima facie* case of retaliation under Title VII requires a showing that: (1) the employee was engaged in an activity protected under Title VII; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) there was an employment action that disadvantaged the plaintiff; and (4) there was a causal connection between the employee's protected activity and the adverse action taken by

Reed expresses frustration over having not been informed of the complaints against the plaintiffs).

**312**

the employer. *See Cruz*, 202 F.3d at 566; *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995); *Ricks*, 92 F.Supp.2d at 344–45. The requisite causal connection may be established "indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan*, 842 F.2d at 593 (citing *Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986)).

If a plaintiff makes such a showing, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. *See Tomka*, 66 F.3d at 1308. If the defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for retaliation. *Id.*

Title VII defines protected activities as: (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding. *See Ricks*, 92 F.Supp.2d at 345 (citing *Gilani v. Nat'l Ass'n of Sec. Dealers, Inc.*, No. 96 Civ. 8070, 1997 WL 473383, *7 (S.D.N.Y. Aug. 19, 1997)). A plaintiff need not show that her discrimination claim was itself valid in order to prevail against a defendant for retaliating against her for making the complaint. *Sumner v. United States Postal Serv.*, 899 F.2d 203, 208–09 (2d Cir.1990).

In this case, plaintiffs allege that defendants terminated them in retaliation for their complaints of discrimination, both formal and informal. Lydia Griffin's formal NYSDHR complaint clearly falls into the category of "protected activity." To the extent that Shirretta Griffin and Trent supported Lydia Griffin's formal claim, these activities also constitute "protected activity" under Title VII. *Cruz*, 202 F.3d at 566 (citing *Sumner*, 899 F.2d at 209). Although plaintiffs have again provided almost no detail of their record of informal complaints, we again assume for the purposes of this motion that such complaints were made. Inasmuch as plaintiffs acted in way opposed to discriminatory treatment, such behavior also would constitute protected activity. *Id.; Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465–66 (2d Cir.1997).

Plaintiffs, though, still have trouble surviving summary judgment on the fourth prong of their *prima facie* case in that they do not provide sufficient evidence of a "nexus between the protected activity and the adverse action taken." *See Wanamaker*, 108 F.3d at 465. It is true that plaintiffs' paid suspension came only two days after defendants learned of Lydia Griffin's complaint to the NYSDHR. However, this fact alone cannot establish the required causal connection between their complaints and their suspension and eventual termination. *See Vails v. the Police Dep't of the City of New York*, 54 F.Supp.2d 367, 378 (S.D.N.Y.1999) (collecting cases that establish the proposition that timing alone is insufficient to meet plaintiff's *prima facie* burden of showing retaliation); *Wilson v. Reuben H. Donnelley Corp.*, No. 98 Civ. 1750, 1998 WL 770555, *4 (S.D.N.Y. Nov. 2, 1998) (" '*Post hoc ergo propter hoc* ' is a logical fallacy that has never been the law of this Circuit.") (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997)). The extensive record created by defendants demonstrate that defendants were taking "clear steps" to their termination long before Lydia Griffin filed her formal complaint with the NYSDHR. *See Ricks*, 92 F.Supp.2d at 347.

Even construing plaintiffs' vague allegations of informal complaints to Oderwald and Zolcinski in the light most favorable to plaintiffs, they have offered no evidence that these complaints predated the litany of complaints against them by their co-workers, or the corresponding concerned e-mails sent among the Salon's management. *See Clerge v. Edison*, No. 95 Civ. 9072, 1999 WL 239688, *5 (S.D.N.Y. Apr. 23, 1999) (finding no retaliatory dismissal

where such dismissal was "plainly taken in response to plaintiff's frequent and well-documented infractions"). And when plaintiff is fired by someone different than those to whom she has complained, after a sustained period of reported incidents with co-workers, the chain of causation is broken. *Kodengada v. I.B.M. Corp.*, 88 F.Supp.2d 236, 245 (S.D.N.Y.2000).

Moreover, even assuming plaintiffs can make out their *prima facie* case for retaliatory discrimination, for the reasons discussed above, there is still no reason to believe that their termination was pretextual. Again, a discharge based on a series of complaints from co-workers, whether the complaints were accurate or not, is not prohibited by Title VII, particularly where the complaints are as amply documented as they are here. *See Brady*, 91 F.Supp.2d at 512–13; *Clerge*, 1999 WL 239688, at *5. As a result, plaintiffs' retaliation claims against the Salon must be dismissed as well.

### C. Hostile Work Environment

An employer will also be liable under Title VII for permitting a discriminatory hostile work environment, that is, a "workplace [that is] permeated with discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal references omitted). *See also Richardson*, 180 F.3d at 436. "The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997). "Conduct that is 'merely offensive, unprofessional or childish is not discriminatory conduct proscribed by Title VII.'" *Ricks*, 92 F.Supp.2d at 345 (quoting *Cosgrove v. Federal Home Loan Bank of N.Y.*, No. 90 Civ. 6455, 1999 WL 163218, at *20 (S.D.N.Y. Mar. 23, 1999)). *See also Schwapp v.*

*Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.").

"Isolated instances of harassment ordinarily do not rise to this level." *Cruz*, 202 F.3d at 570 (citing *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir.1992)). "Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Id.* (quoting *Perry*, 115 F.3d at 149) (internal citations omitted). Where the acts alleged against defendants are merely offensive, rather than physically threatening, humiliating, or hampering to plaintiff's job performance, summary judgment is properly granted. *Id.; Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 319 (2d Cir.1999).

Factors to be considered when determining whether an environment is hostile or abusive include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) what psychological harm, if any, resulted. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Richardson*, 180 F.3d at 437. *See also Schwapp*, 118 F.3d at 110–11. This evaluation must be made in light of "whether a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." *Richardson*, 180 F.3d at 436 (rejecting the use of the perspective of the particular ethnic or gender group, "e.g., a 'reasonable African-American' or a 'reasonable Jew'").

As with a Title VII claim alleging a discriminatory adverse employment decision, a plaintiff in a hostile environment case must demonstrate that there are cir-

cumstances giving rise to an inference of discriminatory intent behind the abusive conduct. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). A plaintiff need not be the direct target of the discriminatory harassment, or a member of the protected group specifically subjected to offensive remarks and behavior as long as the challenged conduct "contribute[d] to the overall hostility of the working environment for a minority employee." *Cruz*, 202 F.3d at 570 (citing *Schwapp*, 118 F.3d at 111–12).

▪▪▪ In this case,[18] plaintiffs' allegations against McKay and Zolcinski simply do not rise to the level of a racially hostile working environment as defined by Title VII. "Title VII requires more than a merely 'episodic pattern' of offensive discriminatory conduct." *Ricks*, 92 F.Supp.2d at 348 (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987) and citing *Shabat v. Blue Cross Blue Shield of the Rochester Area*, 925 F.Supp. 977, 982–83 (W.D.N.Y.1996)). The verbal incidents alleged against McKay and Zolcinski are nonspecific and, at best, episodic in nature rather than pervasive. *See Arroyo v. WestLB Admin., Inc.*, 54 F.Supp.2d 224, 229–30 (S.D.N.Y.1999) (citations omitted). "Casual comments, or accidental or sporadic conversation, will not trigger [ ] relief pursuant to the statute." *Id.* (quoting *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986)).

Plaintiffs have not offered sufficient facts for any reasonable jury to begin to gauge how frequently the allegedly discriminatory conduct occurred. As in *Barua*, 1998 WL 915892, at *4, "the evidence that plaintiff[s] proffer . . . is so devoid of particularization that, after excluding the wholly conclusory assertions, there remains competent admissible evidence of only a very few incidents of [arguably] racial slurs—far from sufficient." They do not allege that they were physically threatened and provide no concrete or expert evidence of psychological harm or witnesses to the alleged incidents that could attest to plaintiffs' level of humiliation. *See Wilson v. Consolidated Edison Co. of New York*, No. 96 Civ. 7546, 2000 WL 335733, *6 (S.D.N.Y. Mar. 30, 2000) (awarding summary judgment where plaintiff failed to describe "how he was harmed or how his alleged hostile work environment interfered with his work performance"). "[G]eneralized feelings of discomfort [fall] well short of the proof required to show a hostile work environment." *Williams v. County of Westchester*, 171 F.3d 98, 101–02 (2d Cir.1999).

Moreover, defendants' alleged use of the phrases "street person," "break up the gang" and "you people" cannot be deemed inherently racially offensive without greater specificity as to the context of their usage. *See Cruz*, 202 F.3d at 570 ("Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances."); *Clerge*, 1999 WL 239688, at *3 (finding generalized allegations that supervisors had referred to plaintiff as "boy" were insufficient, without more, to support

---

**18.** "[A]n employee who brings a claim for hostile work environment harassment by a supervisor is entitled to a presumption that the employer is liable for the harassment." *Cruz*, 202 F.3d at 572, n. 8 (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Here, McKay and Zolcinski were clearly plaintiffs' supervisors. "The employer may rebut that presumption . . . 'if it can plead and prove, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and promptly correct any [ ] harassment by such supervisor, and (2) the employee unreasonably failed to avail herself of any corrective or preventative opportunities provided by the employer or to avoid harm otherwise.' " *Id.* However, as defendants have not asserted an affirmative defense on these grounds, the presumption remains that plaintiffs' employers would be potentially liable for the creation of a hostile working environment, were it not for our further findings, *infra*.

hostile work environment claim).[19] Here, there are no allegations that anyone in defendants' employ other than the plaintiffs themselves used an "unambiguously racial epithet." *See generally Richardson,* 180 F.3d at 439. As the Supreme Court has stated, the "mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. "[A]llegations of isolated encounters that were not definitively discriminatory do not amount to severe and pervasive conduct." *Wilson,* 2000 WL 335733, at *6.

Plaintiffs' charge that McKay and Zolcinski made "false accusations" against the plaintiffs are also insufficient to create the inference of a hostile working environment. "Though plaintiffs may have endured hostility at the hands of their supervisors, the record shows at most that such hostility was based on non-racial grounds," such as the litany of complaints against them by their co-workers. *Brady,* 91 F.Supp.2d at 508–09. *See also Ricks,* 92 F.Supp.2d at 348; *Arroyo,* 54 F.Supp.2d at 231. Plaintiffs must set forth "direct comparative evidence" to show how their supervisors treated them discriminatorily *vis à vis* those outside their protected group. *See Oncale,* 523 U.S. at 80–81, 118 S.Ct. 998. Here, plaintiffs have provided no such evidence beyond their own conclusory allegations to dispute the complaints against them. *See Clerge,* 1999 WL 239688, at *4 (granting summary judgment in a racial discrimination case where plaintiff "rest[ed] upon mere allegations and denials" to rebut charges of his poor performance). As in *Kodengada,* 88 F.Supp.2d at 243, it is more likely that the hostility plaintiffs encountered "largely reflected a clash of personalities rather than discriminatory animus."

Accordingly, summary judgment must be granted for the defendants on plaintiffs' hostile work environment claim.

### D. *Plaintiffs' § 1981 Claim*

█ Plaintiffs also bring claims under 42 U.S.C. § 1981, alleging that defendants deprived them of their federally protected right to contract. To establish a § 1981 claim, a plaintiff must show: (1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981. *Lauture v. I.B.M. Corp.,* 216 F.3d 258, 261 (2d Cir.2000). The Second Circuit has recently held that claims of workplace discrimination by an at-will employee do constitute such activity protected by § 1981. *Id.* at 262–63. *See also Equal Employment Opportunity Commission v. Die Fliedermaus, L.L.C.,* 77 F.Supp.2d 460, 469–70 (S.D.N.Y.1999).

In this case, however, plaintiffs' claims under § 1981 are dismissed because, just as they have failed to create a triable issue of fact with respect to their Title VII claims, so have they failed to do with respect to their § 1981 claims. *See Ricks,* 92 F.Supp.2d at 349; *Humphrey v. Council of Jewish Federations,* 901 F.Supp. 703, 710–11 (S.D.N.Y.1995).

### E. *Lydia Griffin's Retaliation Claim Against Origins*

█ Finally, Lydia Griffin alleges that her dismissal from Origins was ordered in retaliation for her complaints against the staff at the Salon. Like her retaliation claim discussed, *supra,* this claim does not survive analysis. Initially, Griffin cannot make out her *prima facie* case because, as above, she has not produced sufficient evidence to demonstrate a reasonable "nexus between the protected activity and the ad-

---

19. *See also Pratt v. City Mission Society, Inc.,* No. 97 Civ. 0515E, 1999 WL 1067577, *5 (W.D.N.Y. Nov. 15, 1999) (refusing to find discriminatory nexus between defendants' use of the phrase "you people" with subsequent adverse employment action).

verse action taken." *See Wanamaker,* 108 F.3d at 465. Griffin's proof of retaliatory dismissal rests on two allegations: (1) Origins is affiliated with Estée Lauder, and (2) her immediate supervisor, Bruner, would not corroborate her claim that she disclosed the reason she had been previously terminated from the Salon. L. Griffin Aff. ¶ 8. These claims amount to nothing more than conclusory allegations. Plaintiff must allege more than a mere corporate affiliation to create an inference that Origins' staff were aware of her protected activity at the Salon, let alone that they engaged in retaliation for it. *See, e.g., Kodengada,* 88 F.Supp.2d at 245 (requiring more direct evidence of a connection between the protected activity and the decision-maker of the challenged action).

In addition, plaintiff falls far short of meeting her burden of creating a genuine issue if material fact with respect to Origins's asserted reason for her firing. Whether or not she described problems she had endured at the Salon during her job interview, Griffin clearly provided a misleading "reason for leaving" her job at the Salon on her written application. *See* Bruner Dec. Ex. A. Under the very terms of the application, omissions from the document constituted permissible grounds for dismissal. Moreover, once Origins' management learned of the history of complaints against Griffin, they were within their rights to limit their own exposure to personnel trouble as well as possible Title VII liability for any future acts on the part of Griffin. As stated before, plaintiff cannot overcome well-documented reasons for her dismissal through sheer surmise and conjecture. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (1995); *Ricks,* 92 F.Supp.2d at 347; *Clerge,* 1999 WL 239688, at *5. As a result, Griffin's retaliation claim against Origins must fail as well.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

The Clerk of the Court is directed to enter judgment for the defendants and close the above-captioned case.

**IT IS SO ORDERED.**