Yashua Amen Shekhem'
EL–BEY, Plaintiff,

v.

THE CITY OF NEW YORK,
et al., Defendants.

Nos. 97 Civ. 4177(JES), 98 Civ.
2745(JES), 99 Civ. 12490(JES),
00 Civ. 9260(JES).

United States District Court,
S.D. New York.

May 16, 2001.

288

Yashua Amen Shekhem' El–Bey, New York City, Plaintiff, pro se.

Michael D. Hess, Corporation Counsel of the City of New York, New York City, for City Defendants, Frank M. Esposito, Assistant Corporation Counsel, of counsel.

Koehler & Isaacs LLP, New York City, for Union Defendants, Marc Alain Steier, of counsel.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff *pro se* Yashua Amen Shekhem' El–Bey ("plaintiff" or "Mr. El–Bey"), a former correction officer for the New York City Department of Corrections ("the DOC"), brings these four (4) actions against various defendants including the City of New York ("the City"), certain individual DOC employees, various other individual New York City officials,[1] the Correction Officers' Benevolent Association of the City of New York, Inc. ("COBA"),[2] and various COBA officers.[3] Plaintiff's complaints in these actions raise various claims under an eclectic grouping of authorities, including, *inter alia*, the United Nations Charter; plaintiff's intrinsic and fundamental human rights; 42 U.S.C. §§ 1981, 1983, 1985, 1986; 28 U.S.C. §§ 1343(a)(2–4), 453, 1331, 1367(a), 1651, 2201, and 2202; and various articles of the United States Constitution. At the core of all of plaintiff's claims is his contention that defendants violated his rights both during and after plaintiff took sick leave for lengthy periods of time in 1994, 1995, 1996 and 1997. Defendants deny plaintiff's allegations and now move for summary judgment against plaintiff for all claims raised in *El–Bey v. City of New*

---

1. The City and the individual DOC and City employee defendants will be collectively referred to as the "City Defendants."

2. Defendant COBA is not joined in Mr. El–Bey's most recent action, *El–Bey v. City of New York,* No. 00 Civ. 9260.

3. COBA and the individual COBA defendants will be collectively referred to as the "Union Defendants."

*York*, 97 Civ. 4177 (*"El–Bey I"*) and *El–Bey v. City of New York*, 98 Civ. 2745 (*"El–Bey II"*). Plaintiff opposes such motions and cross-moves for summary judgment in his favor. For the reasons set forth below, the Court grants defendants' Motion with respect to those two actions and denies plaintiff's cross-motions.

## I. BACKGROUND

Plaintiff began working as a City correction officer on or about June of 1983. *See El-bey I* Fourth Amended Complaint dated April 18, 1997 (*"El–Bey I* Compl.") at 13, ¶ 55. On various occasions in 1994, 1995, 1996, and 1997 plaintiff suffered injuries and aggravated existing injuries that rendered him unfit for full-duty status. In particular, on November 1, 1994 plaintiff injured his neck, back and head in an off-duty car accident; on July 16, 1995 plaintiff suffered a "service connected injury"; and on May 19, 1996 plaintiff was again involved in a car accident. *See id.* at 13–14, ¶ 57. These injuries and subsequent aggravations of these injuries caused plaintiff to take various and prolonged periods of leave from work. Over a period of twenty (20) months between 1995 and 1997 plaintiff was only available for work for approximately seven (7) weeks; in fact, plaintiff missed approximately 200 days of work during 1996, and he missed every day in 1997 until June 13 of that year. *See id.;* Declaration of Stephen A. Ricci dated February 24, 2000 ("Ricci Decl."), Exhibit ("Exh.") Q, Charges and Specifications No. 482/97.

During this time, plaintiff was subject to the DOC's sick leave directives. Pursuant to these directives, the DOC took numerous actions against plaintiff. For instance, the DOC designated plaintiff as a "Category B" chronic absentee on May 10, 1995 because plaintiff had reported sick on twelve (12) or more work days within a twelve (12) month period. *See id.* at 15, ¶ 65; Declaration of Yashua Amen Shekhem' El–Bey dated July 13, 2000 ("El–Bey Decl."), Exh. G., DOC Directive 2258R ("Directive 2258R") at 2 (describing the Category B classification). Moreover, during the above-described twenty month period, the DOC suspended plaintiff four (4) times because of plaintiff's noncompliance with its sick leave policies. *See* El–Bey Decl. at Exh. U. Such noncompliance included, but was not limited to, plaintiff's refusal to cooperate with DOC officials that tried to confirm that plaintiff was adhering to the home confinement portions of DOC Directives 2258R and 2262. *See* Deposition of Yashua Amen Shekhem' El–Bey, April 26, 1999 ("04/26/99 El–Bey Depo."), at 61–64. Additionally, on or about June, 1997, the DOC asked, and plaintiff refused, to submit to required medical examinations. *See id.* at 107–08. On August 12, 1997, shortly after his fourth suspension, plaintiff received notice that the DOC had placed him on unpaid, involuntary medical separation leave. *See El–Bey I* Compl. at 22–23, ¶¶ 111–12. Plaintiff contends that the DOC took each of these actions against him in derogation of his rights of due process.

At various points during his absences from work, plaintiff registered complaints about the DOC's actions with the Union Defendants. In particular, plaintiff expressed to several different COBA officials his belief that certain aspects of the DOC's sick leave directives were unconstitutional. For instance, Plaintiff complained to and requested assistance from COBA regarding the DOC's home confinement policy ("the home confinement policy"). *See El–Bey I* Compl. at 17–18, ¶¶ 80, 81. Directive 2262 most fully outlines the home confinement policy. In both its pre-and

post-revision form,[4] that directive requires that certain correction officers on sick leave remain in their residence except for one specifically designated four (4) hour period each day; time spent out of the home receiving medical treatment or diagnosis does not count against this four (4) hour period and may be taken at any time. *See, e.g.,* Directive 2262R.

Plaintiff contends now, as he asserted to the Union Defendants during his absences, that the DOC unconstitutionally required that plaintiff "remain in [his] home as a condition of employment ... except for [a four (4) hour period each day] until ... [it was] medically determined [that he was] able to return to work." *El–Bey I* Compl. at 15, ¶ 69. Plaintiff believes that COBA generally failed to assist him in challenging the objectionable portions of the DOC sick leave directives and that the Union Defendants conspired with the DOC to deprive plaintiff of his constitutional rights. *See, e.g.,* Plaintiff's Memorandum

of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross–Motion for Partial Summary Judgment dated June 13, 2000 ("Plaintiff's Mem.") at 3. The many examples plaintiff offers to support his contention that COBA did not act sufficiently on his behalf include: the failure of COBA to 1) "take care of" his chronically sick designation; 2) provide "immediate relief" with regard to the "fraudulently imposed involuntary unpaid medical separation leave of absence"; and 3) prevent the DOC from suspending plaintiff. *See El–Bey I* Compl. at 15, ¶ 66; *El–Bey II* First Amended Verified Complaint dated May 11, 1998 ("*El–Bey II* Compl.") at 10–11, ¶¶ 45, 47. In support of his conspiracy allegations against COBA, plaintiff relies primarily on the *Seabrook* Settlement, which revised the home confinement policy in order to settle COBA's allegations regarding the policy's unconstitutionality.[5] *See supra*

---

4. The DOC agreed to revise Directive 2262 in 1996 as part of a settlement of a lawsuit in which COBA challenged the constitutionality of the home confinement policy. *See Seabrook v. Jacobson,* 95 Civ. 4194 (E.D.N.Y. 1996) (HB), Stipulation and Order of Settlement and Discontinuance dated April 9, 1996 ("the *Seabrook* Settlement"), Exh. A., "Confinement to Residence Revision" ("Directive 2262R"). As revised, the most objectionable aspects of the home confinement policy—like the four (4) hour time-out-of-residence period—apply only to chronic absentee designates like plaintiff. *See id.*

5. Plaintiff's deposition testimony demonstrates that he relies on COBA's prosecution of the *Seabrook* action and the ultimate settlement of that action to support his conspiracy claim:

Q. Do you claim that COBA has conspired with the Department of Correction?
A. It's my firm assertion that individuals within COBA have compromised themselves to the [C]ity, to the Department of Correction.
Q. What do you mean by compromise themselves?

A. Basically collusion. I base that upon the conference that I had that was [on] February 26, 1996 with the Deputy Skinner.

Deposition of Yashua Amen Shekhem' El–Bey, September 29, 1999 ("09/29/99 El–Bey Depo.") at 10. At the conference plaintiff mentions, plaintiff says he was told that COBA had "lost" what plaintiff assumed was the *Seabrook* case. *See* Deposition of Teresa Braxton, September 22, 1999 at 15–16, 23–24; 04/26/99 El–Bey Depo. at 71–72. That conference was attended by plaintiff, defendant Terrence Skinner, a DOC Deputy Warden, and defendant Teresa Braxton, a former Third Vice President of COBA. *See id.* at 9. Yet it is the *Seabrook* Settlement itself that plaintiff emphasizes in support of his conspiracy claims:

Q. I'm going to ask you again. What about that settlement was conspiratorial?
A. The fact that Norman was not an injured party, that he can just waltz in, include himself as a plaintiff and go into court, enter into a stipulated agreement wherein those who are already being damaged which is ongoing [sic], it seemed as

note 4. The essence of plaintiff's complaint regarding the *Seabrook* Settlement is that the revised version of 2262 only exempted DOC officers from the home confinement policy for the first eight (8) days of sick leave. *See* 2262R. Plaintiff is not aware of any specific actions that COBA officials and DOC officials took in concert regarding him; plaintiff also has no specific knowledge of communications between COBA officials and DOC officials regarding him. *See* 09/29/99 El–Bey Depo. at 31–39, 42–44; 04/26/99 El–Bey Depo. at 70–79.

Plaintiff also contends that the DOC intentionally misapplied its sick leave directives against plaintiff. Specifically, plaintiff argues that Directives 2258 and 2262 apply only to correction officers that "report[ ] sick." *See* Plaintiff's Mem. at 12. According to plaintiff, "though the sick leave directive has been so ordered by a [F]ederal Court to be constitutional on its face and as applied relative to *'sick employees'* [6] who 'report[ ] sick' ... it was evidently unconstitutionally applied to plaintiff" because he was "injured" and not "sick." *Id.* (emphasis in original). Thus, plaintiff believes that the defendants engaged in a "fraudulent scheme" to apply a policy designed for sick people to plaintiff, who was, by way of contrast, injured. *See id.*

Plaintiff further alleges that the DOC retaliated against him for complaining about the unconstitutionality of its sick leave directives. In particular, plaintiff asserts that DOC officials more stringently enforced DOC policies against him following the initiation of *El–Bey I* in June of 1997. To the extent that the Court is able to discern from plaintiff's prolix pleadings, deposition testimony, and briefs, plaintiff bases this claim on visits to his home by DOC officials following his initial complaint and on the AWOL designation and Medical Separation that followed such complaint. *See, e.g.,* 04/26/99 El–Bey Depo. at 107; *El–Bey II* Compl. at 14, ¶ 64.

Plaintiff also seems to indicate that the City Defendants discriminated against him because of his race, which he describes as "Moorish–American." Again, to the extent discernable to the Court, plaintiff argues that the DOC discriminated against him and other minority DOC officers because its systematic enforcement of DOC sick leave policies had a disparate impact on minority officers. *See* 04/26/99 El–Bey Depo. at 97–98. The basis for this allegation seems to be that minorities make up a disproportionate number of DOC's correction officers.[7]

though the conduct of Norman was to create a Res Judicata type of situation where anyone else would bring a claim would fail in court automatically. Just the language of that stipulation seems to elude to that ...

....

Q. What about that settlement do you feel is fraudulent?

A. The fact that not every one was actually made aware of that lawsuit, such as myself, which was in the conference. The fact that Norman Seabrook wasn't an injured party. 09/29/99 El–Bey Depo. at 100–01.

6. Plaintiff is referring here to the decision of The Honorable Jed Rakoff of this Court in *Monahan v. City of New York Dep't of Correc-*

*tion,* 10 F.Supp.2d 420 (S.D.N.Y.1998), which the Court addresses *infra* at Part II.

7. Perhaps the clearest evidence that plaintiff's discrimination claim sounds in disparate impact can be found in his own deposition testimony:

Q: What is the basis for you alleging that they discriminated against you based upon you being a Moorish American or a non-caucasian?

A: Systematic problem that they have dealing with individuals who are on sick leave, who comprise most [sic] of non-caucasian.

Defendants deny all of plaintiffs allegations. The City Defendants emphasize that all aspects of their sick leave policy are constitutional and that, in any event, plaintiff's claims are barred by the doctrine of *res judicata* because of various previous actions that addressed the constitutionality of the relevant directives. The City Defendants further note that plaintiff has offered nothing but conclusory allegations in support of his claims of retaliation and discrimination. The Union Defendants join these arguments and stress that, because the Union Defendants are not state actors, they cannot be implicated in plaintiff's constitutional claims. Moreover, the Union Defendants argue that plaintiff's claims against COBA, the individual COBA defendants, and COBA's counsel are better characterized as claims for a breach of the duty of fair representation over which this Court has no jurisdiction.

## II. DISCUSSION

A court may grant summary judgment only if it determines that there are no genuine issues of material fact based on a review of the pleadings, depositions, answers to interrogatories, admissions on file and affidavits. *See* Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When ruling on a summary judgment motion, a court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no genuine issue as to any material fact exists, the moving party is entitled to summary judgment as a matter of law. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

█ As the Court noted above, plaintiff's allegations in this action are numerous, varied, prolix, and otherwise generally difficult to discern. Yet, given the Court's duty to "read the pleadings of a *pro se* plaintiff liberally and interpret them to raise the strongest arguments that they suggest," *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotations omitted), it appears from the record just described that plaintiff sets forth six (6) categories of legal claims against defendants. First, plaintiff argues that the DOC's sick leave policies are unconstitutional on their face and as applied to him. Second, plaintiff contends that the DOC disciplinary actions taken against him violated his rights of due process. Third, plaintiff asserts that the DOC retaliated against him for engaging in protected activities. Fourth, plaintiff claims that the DOC sick leave policies had a disparate impact against minority correction officers and that the City Defendants otherwise more stringently enforced those leave policies against him than it did against other officers. Fifth, plaintiff believes that the Union Defendants failed to correct the dis-

Q. So you are only alleging that because the policy disproportionately effects [sic] non-caucasians?
A. That's correct.
. . . .
Q. . . . Are you alleging that the [D]epartment of [C]orrection discriminated against you personally because you are a non-caucasian?
A. Yes.
Q. What is the basis of that allegation?
A. It is the systemic practice of the [D]epartment to come up against individuals who is [sic] not complying with certain rules, which being the policy, the restriction [sic] policy.
04/26/99 El–Bey Depo. at 97–99.

ciplinary actions taken against him and also conspired with the City Defendants to deprive him of his constitutional rights. Finally, plaintiff alleges that the various nefarious actions taken against him by defendants give rise to state law actions such as fraud, intentional infliction of emotional distress, and false imprisonment. For the foregoing reasons, the Court finds that defendants are entitled to summary judgment on all of plaintiff's claims.

### A. Plaintiff's Challenges to the DOC Sick Leave Policies

In his initial pleadings, plaintiff asserts that, on its face, the home confinement policy impermissibly restricts his liberty. *See, e.g., El–Bey I* Compl. at 31–32, ¶¶ 19–22 (plaintiff's "Fifth Cause of Action"). Plaintiff seems to abandon this argument in his motion papers. Plaintiff states, as noted above, that "the 'sick leave' directive has been so ordered by a [F]ederal Court to be constitutional on its face and as applied to *'sick employees.'* who 'report[ ] sick' (see Judge Rakoff's decision in the *Monahan* Case)." Plaintiff's Mem. at 12, ¶ 26 (emphasis in original). Additionally, plaintiff states in his brief that the *El–Bey I* complaint "does not raise a Constitutional or facial Constitutional challenge to the Defendants' Sick Leave policy of DOC relative to individuals who 'report[ ] sick.' " *Id.* at 11 ¶ 24. Plaintiff apparently cannot dispute the effects of prior actions in Federal Court upon his facial challenge. Yet, even if plaintiff had not seemingly abandoned his facial challenge, for the foregoing reasons, the Court finds that both the above-described *Seabrook* Settlement and the *Monahan* decision have a *res judicata* effect that bars plaintiff's facial challenges to the DOC's sick leave policies.

▬ As plaintiff noted, in *Monahan v. City of New York*, 10 F.Supp.2d 420 (S.D.N.Y.1998), Judge Rakoff dismissed constitutional challenges to the DOC sick leave policies. *See id.* at 424–27. The plaintiffs in that case—which consisted of twelve (12) consolidated actions—were former and current City correction officers that belonged to COBA at all relevant times. *See id.* at 422. Like Mr. El–Bey, the *Monahan* plaintiffs challenged the DOC sick leave policies on their face and as individually applied. *See id.* at 424–45. The *Monahan* Court held that "*res judicata* fully disposes of facial unconstitutionality" and continued to explain its basis for this finding—a basis that is equally applicable to plaintiff's facial challenges here:

"*Res judicata* assures the finality of judgments by precluding a party to a lawsuit from litigating a claim more than once." *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995). "*Res judicata* may also preclude claims by parties who were not involved in the earlier lawsuit ... when the precluded party's interests [were] represented" in that lawsuit. *Id.* The doctrine takes effect when (1) there exists an adjudication on the merits in a prior lawsuit, (2) the prior lawsuit involved the party to be precluded or a party in privity with that party, and (3) the claims sought to be precluded were raised, or might reasonably have been raised, in the prior lawsuit. *See id.*

All three of these requirements are met here. The voluntary dismissal of the *Seabrook* claims with prejudice constitutes an adjudication on the merits. *See Chase Manhattan*, 56 F.3d at 345. Privity is established because the plaintiff in the *Seabrook* case brought that action "in his capacity as President" of the union that represented all of the instant plaintiffs in connection with the very issues here raised: he and they were thus in privity as a formal matter, as a practical matter, and as a matter of

the identity of interests between those involved in *Seabrook* and those involved in the instant actions. *See id.; see also Nash v. Bowen*, 869 F.2d 675, 679 (2d Cir.1989) (judgment rendered against an association may serve as *res judicata* with respect to claims later asserted by members of that association). Finally, as to identity of claims, *res judicata* bars not only the instant claims under the First and Fourteenth Amendment (alleging violation of plaintiffs' rights to freely associate, vote, practice religion and exercise freedom of speech), which were expressly raised in *Seabrook,* but also the closely-related Fourth and Fifth Amendment claims (alleging that home confinement constituted an unreasonable search and seizure and violated plaintiffs' rights to privacy and due process), which reasonably could have been raised in the earlier proceeding. *See id.*

*Monahan,* 10 F.Supp.2d at 424–25. The various bases for the *res judicata* holding of *Monahan* apply to plaintiffs claims here. Both the *Seabrook* and *Monahan* cases constitute dismissals on the merits. In fact, the *Monahan* Court expressly held that the challenges to the sick leave policies in that case also failed on the merits. *See id.* at 424–25 (finding that Directive 2262 survived rational basis scrutiny). Additionally, and for the same reason stated in *Monahan,* Mr. El–Bey is in privity with the plaintiffs in the *Seabrook* case; plaintiff also has an identity of interests with the *Monahan* plaintiffs. Finally, because the *Seabrook* and *Monahan* cases addressed various facial challenges to the DOC sick leave policies, all of plaintiff's current facial challenges to those policies are barred on *res judicata* grounds.

■ Plaintiff cannot escape this effect by claiming that the DOC's sick leave policies applied only to "sick" correction officers and not to "injured" officers like plaintiff. Putting aside the clear distinction-without-a-difference nature of plaintiff's argument, plaintiff cannot assert that he is entitled to the benefits of the sick leave policies—such as paid leave from duty-but is simultaneously excluded from their reach because he is injured. The *Seabrook* and *Monahan* plaintiffs could have, but for probably obvious reasons did not, raise such an argument and hence *res judicata* bars this argument as well. But putting aside the logical inconsistencies and legal bars to plaintiff's claim, since Directive 2258R sets forth an "absence control program," the Court finds that it applies to injured officers despite its repeated references to sick leave. *See* Directive 2258R at Part I. The Court also finds that Directive 2262R applies to plaintiff because, by its express terms, that directive applies to both "injured" and "sick" officers. *See* Directive 2262R (referring to "members injured" and "members who report sick"). Accordingly, the Court rejects plaintiffs contention that the DOC intentionally misapplied its sick leave policies to him.

## B. *Due Process Claims*

■ Plaintiff alleges that the City Defendants acted in derogation of his due process rights when they summarily suspended him from duty and then placed him on unpaid, involuntary medical separation. *See, e.g., El–Bey II* Compl. at 17, ¶¶ 3, 4. The Court denies plaintiff's claims as they are both barred on *res judicata* grounds

Plaintiff was party to an action before The Honorable Lewis Kaplan of this Court, *Jawan Akil Bey v. City of New York,* 98 Civ. 1353 (S.D.N.Y Apr. 29, 1998), in which the Court denied a virtually identical challenge to the City's summary suspension policies. *See Akil Bey,* 98 Civ. 1353, Order dated March 29, 1998 at ¶ 5. In that case, Judge Kaplan addressed and

dismissed plaintiffs' due process challenge to the summary suspension procedures defendants' used pursuant to authority granted them by Section 75 of the New York Civil Rights Law ("Section 75") and Section 9–112 of the City Administrative Code ("Section 9–112"). *See id.* Plaintiff can not avoid the *res judicata* effects of that decision by relying upon the distinction between a summary suspension—which Judge Kaplan explicitly addressed—and being placed on unpaid medical separation leave.[8] Plaintiff could have reasonably raised such a claim before Judge Kaplan and he is therefore barred from making it before this Court. Also, as noted in *Akil Bey*, Section 75 has been found constitutional. *See Anderson v. Dolce*, 653 F.Supp. 1556, 1567 (S.D.N.Y.1987). Finally, Judge Kaplan found Section 9–112 did not violate the constitutional due process rights of COBA officers. *See Akil Bey*, 98 Civ 1353, at ¶ 5. For these reasons, plaintiff's due process claims are dismissed as barred by the doctrine of *res judicata.*

## C. *Plaintiff's Retaliation Claim*

 Plaintiff asserts that certain City Defendants used the enforcement mechanisms of the DOC sick leave policies to harass him and to retaliate against him for both complaining about those policies and ultimately filing civil rights actions in this Court. Like similar individual claims in *Monahan,* plaintiff's contentions seem "sufficiently general [and] sufficiently inherent in a neutral application of amended Directive 2262 that they reasonably could have been raised" in that action or in the *Seabrook* action. *See Monahan,* 10 F.Supp.2d at 424. For instance, plaintiff complains of the repeated visits to his home by City Defendants such as Captain

Arthur Polite ("Captain Polite"), of the Health Management Division ("HMD") of the DOC, which he characterizes as both harassing and retaliatory. *See, e.g.,* 04/26/99 El–Bey Depo. at 48, 61. Plaintiff notes that during these visits he was asked to comply with the home confinement policy by doing things such as signing an "absence control roster"—which he refused to do on most occasions. *See id.* at 61–62. Plaintiff also objects to the DOC's requirement that he secure permission to leave his house to do things like attend to his ill Mother. *See, e.g.,* Plaintiff's Mem. at 8–9, ¶ 18 (noting that plaintiff was denied permission to visit his mother prior to her death in 1996). Protests about such routine enforcement activities could easily have been raised in the *Seabrook* action and in fact were raised in the *Monahan* action. *See, e.g., Monahan,* 10 F.Supp.2d at 425–26 (describing the assertion of several plaintiffs that Directive 2262 prevented them from engaging in leisure, social, religious, and family activities and noting that several plaintiffs had difficulties with "logging out"—*i.e.* requesting permission to leave their residences). Because these challenges to the validity of the enforcement mechanisms of the sick leave policy could reasonably have been brought in *Seabrook* and were in fact brought in *Monahan,* the Court finds that they are barred as a matter of law.

 However, since, like many of the *Monahan* plaintiffs, Mr. El–Bey claims defendants specifically targeted him for disparate treatment and retaliated against him for his complaints, these claims are "not barred by *res judicata* [but must be] dismissed because [they] are without factu-

---

**8.** Plaintiff's papers do not specifically make the case that a summary suspension and the imposition of unpaid, involuntary medical separation are distinct claims. The Court dis-

cusses this point in accordance with its duty to construe the papers of a pro se plaintiff in the fashion that presents the best possible argument. *See McPherson,* 174 F.3d at 280.

al support." *Id.* at 426. First, plaintiff has failed to meet his evidentiary burden in support of his retaliation claim. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show

> (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. Upon such a showing, the defendant must articulate legitimate nondiscriminatory reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive.

*Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 130 (2d Cir.1996) (internal quotations and citations omitted); *accord Tomka v. Seiler,* 66 F.3d 1295 (2d Cir.1995); *Manoharan v. Columbia University College of Physicians and Surgeons,* 842 F.2d 590, 593 (2d Cir.1988).

▉ Since plaintiff made multiple written complaints about the DOC's policies and ultimately filed his first action with this Court in June of 1997, he was clearly engaged in protected activities. At least some of the defendants were aware of plaintiff's complaints both before and after he filed the first complaint in *El–Bey I.* Hence the Court will presume, for the sake of argument, that all relevant defendants were aware of all of plaintiff's complaints regarding the sick leave policy. Moreover, because the DOC designated plaintiff a chronic absentee, summarily suspended him four (4) times, and ultimately placed him on unpaid medical separation leave, he meets the "adverse action" element of his *prima facie* case. The Court finds, however, that plaintiff has not proven a causal connection between his protected activities and the DOC's adverse employment actions.

Quite simply, the uncontroverted evidence before the Court shows that plaintiff repeatedly and openly defied the DOC by ignoring the requirements of its sick leave policies. Plaintiff defied these policies both before and after he complained about the various adverse employment actions defendants took against him. Plaintiff concedes this defiance in his own deposition testimony. For instance, when asked why he would not sign the aforementioned absence control roster when DOC officials visited his home, plaintiff responded: "[b]ecause ... there's no law that says I have to sign anything if I don't want to sign it. The reason was it was basically, in protest [of] what I was going through, in protest of the restrictions." 04/26/99 El–Bey Depo. at 61–62. Plaintiff also does not contest the accuracy of documentary evidence which shows: 1) plaintiff was found by DOC officials to be away from his home in violation of the home confinement policy on June 8, 1996, November 26, 1996, and June 5, 1997, *see* El–Bey Decl. at Exh. U, Notices of Summary Suspension from Duty; and 2) plaintiff failed to provide documentation, as required, for all of his 202 absences from work between January 1, 1996 and December 31, 1996 and for all of his absences between January 1, 1997 and May 2, 1997, *see* Ricci Decl., Exh. Q., Charges and Specifications No. 482/97. The Court cannot identify a single genuine instance of retaliation by defendants against plaintiff. Instead, what appears from the record is a pattern of policy violations and subsequent punishment followed by more policy violations and additional punishment. DOC reprimands and disciplinary actions against plaintiff generated complaints from plaintiff about such actions which in turn begat additional violations, reprimands, and complaints.

This cycle is plain to see from the record before the court. For example, after

plaintiff received notices that the DOC had designated him a Category B chronic absentee as of both May 10, 1995 and July 16, 1995, plaintiff wrote two memoranda to DOC Deputy Warden Hurden, dated August 9, 1995 and August 10, 1995, asserting that Directive 2258R had been misapplied and that such designations violated plaintiff's rights of due process. *See* El–Bey Decl. at Exhs. I, J. Similarly, after DOC officials found plaintiff out of residence in violation of the home confinement policy in June and November of 1996, plaintiff complained about the constitutionality of that policy: 1) on December 20, 1996 in a "Constructive Notice of Waiver of Tort" ("the Tort Waiver") sent to the State of New York and served on various defendants, *see* El–Bey Decl. at Exh. Z; and 2) in a January 23, 1996 letter to Defendant Skinner at the HMD. *See id.* at Exh. V. On February 27, 1997, Captain Polite visited plaintiff's residence whereupon plaintiff refused Captain Polite's request to enter and obtain plaintiff's signature on the absence control roster. *See id.* at Exh. K. On March 9, 2001, plaintiff wrote Defendant Jacobson, who was then Acting Commissioner of the Department of Correction, complaining about the unconstitutionality of the DOC's sick leave policies. *See* El–Bey Decl. at Exh. Z.

The final flurry of policy violations, enforcement and subsequent complaints began in June of 1997. On June 5, 1997, Captain Polite again found plaintiff out of residence in violation of the home confinement policy. *See* El–Bey Decl. at Exh. U, Notice of Summary Suspension dated June 13, 2001. On June 7, 1991, plaintiff filed his first complaint in *El–Bey I* with this Court; plaintiff served that complaint on

various defendants on or about June 13, 1997, the same day that plaintiff's third suspension without pay became effective.[9] *See* Affidavits of Service dated June 17, 1997. As plaintiff concedes in his pleadings, his third suspension from duty for violation of the home confinement policy became effective on June 13, 1997 and was based on the above-described June 5, 1997 home visitation by Captain Polite. *See El–Bey I* Compl. at 22, ¶ 108. As noted above, around this time the DOC, pursuant to its sick leave policies, ordered plaintiff to report to the HMD for a medical evaluation. *See* 04/26/99 El–Bey Depo. at 108; plaintiff disregarded this order because he believed that he was being asked report to the HMD so that defendants could "further harass" him rather than to conduct a medical evaluation. *See id.* After plaintiff again refused to grant access to Captain Polite during a home visit on July 23, 1997, the DOC suspended plaintiff for a fourth time effective July 25, 1997. *See* El–Bey Decl. at Exh. U, Notice of Summary Suspension dated July 25, 1997. Finally, on August 12, 1997 plaintiff received notice that he had been placed on involuntary unpaid medical separation leave.

■ The Court finds that no jury could rationally conclude from the above-described record that there is a causal connection between defendants adverse employment actions and plaintiff's protected activities. Indeed, what is clear from the evidence is not that defendants retaliated against plaintiff but that, instead, plaintiff responded to defendants adverse actions by engaging in protected activities. Moreover, even if the Court assumes, *arguendo,* that plaintiff could show a causal connec-

---

**9.** The first two suspensions occurred in June and November of 1996 respectively. *See* El–Bey Decl. at Exh. U, Notices of Summary Suspension dated November 26, 1996 and June 10, 1996. Both suspensions followed home visitations by the DOC where it was discovered that plaintiff was out of residence in violation of the home confinement policy. *See id.*

tion and therefore prove his *prima facie* case, plaintiff has made no showing that defendants non-retaliatory reason for taking adverse actions against him—*i.e.* that plaintiff repeatedly and openly violated the DOC sick leave policies—was pretextual.

■ Plaintiff offers only conclusory allegations to support his contention that defendants retaliated against him and otherwise harassed him through disparate enforcement of the sick leave policies. For example, in his deposition testimony plaintiff asserts, without elaboration, that all of the home visitations by Captain Polite which occurred after plaintiff served his first complaint in *El–Bey I* were *ipso facto* retaliation. *See* 04/26/99 El-Bey Depo. at 108. Plaintiff seems to base this claim on the close temporal proximity of these visits to the filing and service of his complaint.[10] Such evidence, taken alone, is insufficient as a matter of law to prove the causal connection element of the *prima facie* case. *See, e.g., Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 312 (S.D.N.Y.2000). Moreover, other decisions of the Court make clear that an employee cannot establish the causal connection element of his *prima facie* case or make a showing of pretext when his complaints of discriminatory treatment are preceded by a well documented record of employer complaints about the employee's performance. *See, e.g., Griffin,* 103 F.Supp.2d at 312; *Ricks v. Conde Nast Pubs., Inc.,* 92 F.Supp.2d 338, 347 (S.D.N.Y.2000). Such a record of employer dissatisfaction substantiates the non-retaliatory justification for the employer's adverse actions. Hence, the numerous disciplinary actions defendants took against plaintiff—each of which *preceded* some type of complaint from plaintiff—"demonstrate that defendants were taking 'clear steps' [toward plaintiff's medical separation] long before" plaintiff filed the *El–Bey I* complaint which plaintiff relies upon for his retaliation claim. *See Griffin,* 103 F.Supp.2d at 312 (citation omitted). Apparently recognizing the weakness of his retaliation claim, plaintiff does not even address the evidence showing that most of the home visitations and disciplinary actions occurred long before he filed his complaint with this Court; plaintiff also does not address the evidence showing that all of his protected activities closely followed defendants adverse actions against him. For these reasons the Court denies plaintiff's retaliation claims.

### D. Disparate Impact and Treatment Claims

■ Plaintiff also makes both disparate impact and disparate treatment claims against defendants. As noted above, plaintiff seems to argue that the defendants' actions in enforcing—or allowing the enforcement of—the sick leave policies were discriminatory because a disproportionate number of DOC correction officers are minorities. *See* 04/26/99 El-Bey Depo. at 97–98.[11] To the extent that plaintiff is alleging a disparate impact cause of action pursuant to 42 U.S.C.

---

**10.** "Q.... What makes you think that Polite's visits to your home [were] outright retaliation?

A. Well, he was already served with the complaint."
04/26/99 El-Bey Depo. at 108.

**11.** Plaintiff seems to have abandoned his claim of intentional discrimination pursuant to 42 U.S.C. § 1981. *See* El-Bey Memo. at 10, ¶ 21 (containing note that "Section 1981 claim cannot be sustained due to lack of discovery"). Even had plaintiff not so abandoned this claim, the Court finds plaintiff cannot support a cause of action pursuant to § 1981 insofar as he has offered no evidence, as he must, showing that any of the defendants intentionally discriminated against him because of his race. *See Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988).

§ 2000e–2 (1994), such a claim must fail. To begin, it is curious that the plaintiff alleges discrimination by defendants based apparently upon the *overrepresentation* of minorities in the pool of DOC correction officers. However, disparate impact analysis is more common, and seemingly more appropriate, where a facially neutral employment practice results in the exclusion of a disproportionate number of minorities from a particular employment group. *See generally NAACP v. Town of East Haven,* 70 F.3d 219 (challenging hiring practices of defendants as disproportionately excluding blacks from employment); *Guardians Ass'n of New York City Police Dept., Inc. v. Civil Serv. Comm'n of City of New York,* 630 F.2d 79, 85–88 (2d Cir.1980) (challenging civil service exam failed by disproportionate number of non-whites). Assuming, however, that the overrepresentation of minorities among COBA officers and the application of the DOC sick leave policies to such officers presents an appropriate circumstance for disparate impact review, the Court finds that plaintiff has failed to make out a *prima facie* disparate impact claim.

■■■ Plaintiff offers nothing but conclusory allegations in support of his assertions: that 1) minorities are overrepresented among COBA officers; and 2) the enforcement of the sick leave policies had a disparate impact on minority officers. Plaintiff's failure to present anything resembling the statistical analysis normally used to support such a claim is alone a sufficient basis for its denial.[12] *See*

*Bridgeport Guardians v. City of Bridgeport,* 933 F.2d 1140, 1146–47 (2d Cir.1991). Thus the Court finds that plaintiff's allegation that the DOC sick leave policies had a disparate impact on minority officers must be dismissed.

■■■ Plaintiff also makes a generic discrimination claim pursuant to 42 U.S.C. § 1983. It is well established that to prevail on such a claim plaintiff must "allege conduct under color of state law that deprived him of rights secured by the Constitution or laws of the United States." *Katz v. Klehammer,* 902 F.2d 204, 206 (2d Cir. 1990). "[P]laintiff[ ] must make specific allegations that indicate a deprivation of constitutional rights; general, indirect and conclusory allegations are not sufficient." *Hankard v. Town of Avon,* 126 F.3d 418, 423 (2d Cir.1997). Although, plaintiff has alleged that the City Defendants acted under color of state law to deprive him of his constitutionally guaranteed "liberty rights" through their more stringent enforcement of the sick leave policies against him than against other officers, he has not offered any proof whatsoever in support of these allegations. He has not identified a single other similarly situated correction officer that received more favorable treatment than plaintiff. He has not shown that any of the defendants acted towards him in a way that reflects racial animus or an intent to invidiously discriminate. Even granting plaintiff the lenience afforded to *pro se* litigants, the Court finds that he has offered no evidence from which a rational jury could conclude that defen-

---

**12.** To make out a disparate impact claim plaintiff also has to offer the defendant an alternative policy that does not have the discriminatory effect of the challenged policy. *See Bridgeport Guardians,* 933 F.2d at 1147. Thus, even if plaintiff could make out a *prima facie* case, he does not—and moreover could not—offer an alternative sick leave policy that would avoid the disparate impact he alleges.

Put another way, to escape the type of disparate impact plaintiff describes, the DOC would have to hire fewer minority officers so that a "disproportionate" number of minorities wouldn't be subject to enforcement of the sick leave policies. Such an alternative is at clear cross purposes with the nation's civil rights laws and the Court cannot accept it.

dants either intentionally discriminated against plaintiff on the basis of his race or otherwise took acts against plaintiff that deprived him of a constitutionally protected right.

### E. Plaintiff's Conspiracy and Fair Representation Claims

Plaintiff makes repeated and emphatic allegations that the Union Defendants conspired with the City Defendants to deprive plaintiff of his constitutional rights; alternatively, plaintiff contends that the Union Defendants failed to prevent the City Defendants from depriving him of his rights. As noted above, the primary basis for these claims is that COBA settled the *Seabrook* lawsuit in which COBA had challenged the constitutionality of Directive 2262's home confinement policy. *See Seabrook v. Jacobson*, 95 Civ. 4194 (E.D.N.Y. 1996) (HB); 09/29/99 El–Bey Depo. at 10.

 However, under 42 U.S.C. §§ 1985, 1986, the statutory basis for these causes of action, plaintiff must demonstrate "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). As already noted, plaintiff has demonstrated no such invidious animus and hence these claims must fail.

 Moreover, even if plaintiff had demonstrated discriminatory animus, he has shown no concert of action between the City Defendants and Union Defen-

dants.[13] For instance, as noted above, plaintiff knows of no actions or communications between City and COBA officials regarding him. *See* 09/29/99 El–Bey Depo. at 31–39, 42–44; 04/26/99 El–Bey Depo. at 70–79. Plaintiff did testify that Defendant Braxton (a COBA executive board officer) and Defendant Skinner (a DOC official) communicated in secret prior to a February 26, 1996 conference attended by Braxton, Skinner and plaintiff. *See* 09/29/99 El–Bey Depo. at 76–81 As described above, at the ensuing conference plaintiff says he was told that a lawsuit brought by COBA challenging the home confinement policy—a case plaintiff assumed was the *Seabrook* case—had been "lost" by the union. *See supra* note 5. Granting plaintiff the best inference possible—that COBA and DOC officials conspired to lie to plaintiff about the outcome of the *Seabrook* action—that fact cannot save plaintiff's Section 1985 and 1986 claims. The Court cannot discern—and plaintiff has not alleged—the constitutional injury that flows from such a lie. At worst such misinformation made plaintiff believe that a federal court had found the home confinement policy constitutional. Additionally, the *res judicata* effects of the *Seabrook* Settlement preclude constitutional challenges to the home confinement policy by COBA officers like plaintiff; had defendants Braxton and Skinner never lied to plaintiff, these effects would be unchanged.

 As described above, plaintiff makes various other complaints regarding

---

**13.** The Union Defendants correctly state that, when bringing a cause of action pursuant to Sections 1986 and 1987, failure to show a concert of action between COBA and the City Defendants provides an independent ground for dismissal of all constitutional claims against the Union Defendants. In order to implicate private actors such as COBA and the individual COBA officers charged here, plaintiff must demonstrate that a government entity, such as the DOC, "delegated [its] official authority to the private parties." *Concourse Nursing Home v. Engelstein*, No. 95 Civ. 1666, 1997 WL 672015 at *3 (S.D.N.Y. Oct. 29, 1997) (Knapp, J.) (discussing *NCAA v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988)). Plaintiff has made no such showing here and thus plaintiff's constitutional claims against the Union Defendants must be dismissed for this reason as well.

the failure of the Union Defendants to prevent the City Defendants from violating his constitutional rights. Despite plaintiff's protestations to the contrary, these grievances amount to a claim that COBA breached its duty of fair representation.[14] The Court cannot conceive of another way to construe plaintiff's complaints that COBA failed to correct his chronic absentee designation or to provide immediate relief from the "fraudulently imposed involuntary medical separation leave of absence." *El–Bey II* Compl. at 11, ¶ 47; *see also El–Bey I* Compl. at 15, ¶ 66. Municipal unions such as COBA are excluded from the reach of this cause of action by 29 U.S.C. § 152(2) and therefore state law—New York law—would govern this claim by plaintiff. *See McGovern v. Local 456, Int'l Bhd. of Teamsters, Chauffeurs, & Warehousemen & Helpers of Am., AFL–CIO,* 107 F.Supp.2d 311, 319 (S.D.N.Y. 2000) (Conner, J.). Because the Court dismisses all of plaintiff's federal claims in *El–Bey I* and *El–Bey II,* it declines to exercise supplemental jurisdiction to address this particular state law claim. *See* 28 U.S.C. § 1367(c). Accordingly, the Court denies without prejudice all of plaintiff's claims that COBA, COBA officers, and COBA's counsel breached their respective duties to plaintiff.

### F. Plaintiff's Remaining State Law Claims

Finally, plaintiff alleges a series of state law causes of action including fraud, false imprisonment, and intentional infliction of emotional distress. Again, since the Court has dismissed all of plaintiffs federal causes of action in *El–Bey I* and *El–Bey II,* prudence demands that the Court decline to invoke its supplemental jurisdiction over plaintiff's state law claims. Although the Court is "not required to dismiss [plaintiff's] state claims ... dismissal of such claims is the general rule." *In re Porges,* 44 F.3d 159, 162 (2d Cir.1995). The Court sees no reason to depart from the general rule in the instant cases. Accordingly, plaintiff's state law claims are hereby dismissed without prejudice to be being renewed in the proper state court.

### G. Qualified Immunity

Lastly, plaintiff's claims against the various individual City Defendants must fail because such defendants are entitled to qualified immunity. The numerous individual City employees plaintiff sues in *El–Bey I* and *El–Bey II* are "shielded from personal liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether an official is entitled to qualified immunity depends upon whether his actions were objectively legally reasonable "in light of the legal rules that were 'clearly established' at the time [those actions were] taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Plaintiff has made no showing that the actions of the various individual City Defendants taken against plaintiff were legally unreasonable. Indeed, plaintiff offers only conclusory allegations to support his contention that the individuals he accuses knowingly took acts that violated his constitutional rights. Accordingly, these claims are dismissed.

---

**14.** The federal cause of action for a breach of the duty of fair representation arises where "a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

## CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment in *El–Bey I* and *El–Bey II* are granted and plaintiff's cross-motion for summary judgment is denied. The parties are shall appear before the Court for a Pre–Trial Conference on June 5, 2001 at 3:00 p.m. in Courtroom 705, 40 Centre Street to address plaintiff's two (2) remaining cases before the Court.

**It Is SO ORDERED.**