Franck DORRILUS, Plaintiff,

v.

ST. ROSE'S HOME, Defendant.

No. 00 CIV.4529 RMB.

United States District Court,
S.D. New York.

Dec. 2, 2002.

**328**

Susie Rivers, Brooklyn, NY, for Plaintiff.

John M. O'Connor, DeForest & Duer, Gerald Tobin, Cusack & Stiles, New York City, for Defendant.

### ORDER

BERMAN, District Judge.

On May 18, 1998, Franck Dorrilus ("Dorrilus" or "Plaintiff") filed a complaint ("Complaint") against his former employer, St. Rose's Home ("Defendant" or "St. Rose's"), alleging, among other things, discrimination based on his race (African–American) and national origin (Haitian), disparate pay, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. (1994) ("Title VII"). Plaintiff seeks monetary damages, attorneys' fees, and back pay.

On January 28, 2000, Defendant moved for summary judgment ("Defendant's Motion") under Rule 56(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") arguing, among other things, that (i) it had "no positions open for a nursing assistant at the time [Plaintiff] applied" and (ii)

Plaintiff's allegations "do not constitute a showing that the 'workplace was permeated with discriminatory intimidation.'" Defendant's Motion at 2–3. On or about March 17, 2000, Plaintiff opposed the motion ("Plaintiff's Opposition") and, on or about April 11, 2000, Defendant filed a reply memorandum ("Defendant's Reply").[1]

**For the reasons set forth below, the Court grants Defendant's motion for summary judgment.**

### I. Background

St. Rose's is a home for poor persons with incurable cancer. Defendant's Statement of Material Facts dated January 28, 2000 ("Def.SOF") ¶ 2. On or about June 28, 1995, Dorrilus, a black male of Haitian descent, "walked into" St. Rose's seeking a position as a nursing assistant. Defendant's Motion at 4; Plaintiff's Opposition at 2. Dorrilus spoke to Sister Mary de Paul Mullen ("Sister de Paul"), Director of Nursing, who informed him that St. Rose's had no openings for a nursing assistant. Def. SOF ¶ 3. Sister de Paul asked Plaintiff if he would be interested in a maintenance position (which he was), and then referred him to Sister Mary Denise ("Sister Denise"), St. Rose's Administrator. Defendant's Motion at 4. Plaintiff was offered and accepted a position on the maintenance staff and began working on August 21, 1995. Def. SOF ¶ 4,5. Plaintiff alleges that "he was told a nursing position would be available in two weeks and in the interim he would be temporarily in the maintenance department." Plaintiff's Answer in Opposition to Summary Judgment Motion dated March 17, 2000, at ¶ 13

---

**1.** Neither party has requested oral argument. In any case, the written submissions are sufficient.

("Plaintiff's Answer").[2]  At the time, Plaintiff was one of six maintenance workers, two of whom were black and the others Hispanic.  Defendant's Motion at 5.

Plaintiff experienced job difficulties at St. Rose's as follows:

- On June 7, 1996, Plaintiff allegedly claimed that "he was unable to clean the kitchenettes ... because he was weak from not having slept well." *See* Memo from Sister Denise to Sister de Paul dated June 7, 1996, Ex. L to Affirmation of John M. O'Connor dated January 28, 2000 ("O'Connor Aff.").  Miguel Gonzalez ("Gonzalez"), the maintenance supervisor, informed Dorrilus that cleaning the kitchenettes was part of his job.  *Id.;* Def. SOF ¶ 16.

- On June 27, 1996, Gonzalez asked Plaintiff, by written work order, to "clean basement lobby, dust mop, and mop." Def. SOF ¶ 14.  In response, Dorrilus wrote "Important Notice: Next time, don't forget to put 'please' because military language or psychology is un [sic] use at Rose's." *Id.*

- Plaintiff met with Sister Denise on July 10, 1996, and claimed that "Mike Gonzalez was discriminating against him" because, among other things, Gonzalez "gave out orders to [other maintenance workers] in their hand, but he always put [Plaintiff's] orders on his locker" and "[Gonzalez] would write Please on the orders he gave to other men, but never on [Plaintiff's] orders." Memo from Sister Denise to Sister Kevin, Superior of Home, dated July 11, 1996.  Sister Denise spoke with Gonzalez, who allegedly said that "when he was giving out orders, [Plaintiff] was usually already on another floor." *Id.*

- On August 1, 1996, Plaintiff received a work order requesting that he "clean outside around building."  Work Order dated August 1, 1996, Ex. E to O'Connor Aff. Plaintiff wrote in response: "Important: Please next time, don't forget to put 'please' because military language or psychology is un [sic] use at St. Rose's." *Id.*

- On August 2, 1996, Plaintiff met with Sister Denise and received a written warning which stated:

  [Plaintiff] has had frequent episodes of being at odds with his supervisor, Mike Gonzalez.  He has stated that he feels Mike does not like him and he feels put upon.  [Plaintiff] has been reminded on more than one occasion that Mike was his supervisor and has every right to ask him to do various jobs.  It has been brought to my attention that Frank will not speak to his supervisor, but rather leaves notes.... At this time, I am warning Mr. Dorrilus that there must be a change in behavior—we do not tolerate 'not speaking' at St. Rose's Home. If another warning is necessary along these same lines, a period of suspension may also be given.

  Written Warning dated August 2, 1996, Ex. N to O'Connor Aff. Plaintiff signed the written warning and "certified that I don't have any problem with Mr. Mike." *Id.*

- On October 23, 1996, Plaintiff allegedly stated to Sister Denise "that he was a professional and that he did not see why he was under [Gonzalez]."  Letter to Unknown Recipient from Sister Denise dated October 23, 1996, Ex. O to O'Connor Aff. Sister Denise and Sister de Paul, who joined in the meeting, reiterated that Plaintiff "was hired to work in

---

**2.**  Defendant contends that "From August 21, 1995 through June 9, 1997, ... St. Rose's had no job openings for nursing assistants." Defendant's Motion at 13.

the Maintenance Department and [Gonzalez] was his supervisor." *Id.*[3]

- On October 24, 1996, Sister Denise called a meeting of all the maintenance workers to "reinforce [Gonzalez's] position as Head of Maintenance." Meeting Memo dated October 24, 1996 ("October 24 Meeting Memo"), Ex. K to O'Connor Aff. "[Gonzalez] had been having a lot of trouble with [Plaintiff] doing the work that he was assigned" but Sister Denise did not "like particularly to pick out one particular person." Deposition of Sister Mary Denise dated October 28, 1999 at 111–12 ("Denise Dep."). The five maintenance workers who attended the meeting, including Dorrilus, signed a memo written by Sister Denise that stated: "[w]e have been having some problems here and there. Insubordination will not be tolerated. There is no reason why we cannot work together." October 24 Meeting Memo.

- On November 6, 1996, Plaintiff allegedly reported to Sister Denise that he heard Gonzalez "complaining that he hates black people." Dorrilus Dep. at 95. Plaintiff testified that Gonzalez said that his (Gonzalez's) "daughter [was] married with a black living in New Jersey. [Gonzalez] was so upset about it, complaining that he hates black people and he said it in front of me [Plaintiff], when he sees me, I remind him of his son-in-law." *Id.*[4]

- On November 14, 1996, Dorrilus received a work order to "sweep and mop [the] incinerator medical waste room." Work Order dated November 14, 1996, Ex. H

to O'Connor Aff. Dorrilus allegedly cleaned only part of the room. Denise Dep. at 61. On November 20, 1996, Dorrilus again received a work order to "clean, sweep and mop [the] incinerator medical waste room." November 20 Work Order, Ex. G to O'Connor Aff. Plaintiff told Gonzalez that he did not have time to finish the order that day, but would complete it the next day. *Id.*

- Plaintiff alleges that "from August 21, 1995 until his termination" Gonzalez always referred to him "as 'El Negro' or 'Hey you.'" Complaint ¶ 15. Plaintiff testified that on November 20, 1996, he told Sister Denise that "Mr Gonzalez was making racial statements against me calling me El Negro." Dorrilus Dep. at 106.[5]

- On November 21, 1996, Plaintiff received a work order to "clean sweep outside around building, parking lot & all sidewalk." Work Order dated November 21, 1996, Ex. H to O'Connor Aff. Plaintiff allegedly refused to do the work assigned and verbally challenged Gonzalez. *See* Denise Dep. at 61 ("Plaintiff was very abusive as far as language and signs. He was insubordinate in refusing to do work."). Plaintiff received a three day suspension ("November 21 Suspension"), commencing November 22, 1996, for "insubordination, verbal threat and abusive language to Supervisor, and inability to fulfill work assignments." Def. SOF ¶ 20.

On November 25, 1996, during his suspension, Plaintiff had an automobile acci-

---

3. Plaintiff testified that he told Sisters Denise and de Paul "I can't do it any longer because she promised me in two weeks to get the position. Now it's October 23, 1996. I told her it's time for me to get the position. If I'm not going to get it, to tell me." Deposition of Franck Dorrilus dated July 15, 1999 at 41 ("Dorrilus Dep.").

4. Sister Denise testified that Plaintiff never stated that "Mr. Gonzalez was making derogatory remarks about him." Denise Dep. at 39.

5. Sister Denise testified that Plaintiff never stated that "Mr. Gonzalez was making derogatory remarks about him." Denise Dep. at 39.

dent. Plaintiff's Opposition at 4. Plaintiff alleges that he "lost control" of the vehicle due to "stress, and depression combined with unfair suspension." *Id.;* Dorrilus Dep. at 66. Plaintiff claimed he was disabled and informed Defendant that he could not return to work.[6] Defendant's Motion at 9. From November 26, 1996 to June 2, 1997, Plaintiff received disability payments. Def. SOF ¶ 8. On June 9, 1997, Plaintiff's employment was terminated "because he failed to return to work or to contact St. Rose's." Defendant's Motion at 10. *See also* Def. SOF ¶ 9 (Plaintiff "did not attempt to resume his employment at St. Rose's Home after November 21, 1996").

On July 29, 1997, Plaintiff filed a charge of discrimination against the Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC"). Plaintiff's EEOC Charge, dated July 29, 1997, Ex. X to O'Connor Aff. The EEOC issued a "Right to Sue" letter on February 19, 1998.

## II. Standard of Review

Fed.R.Civ.P. 56 provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 97 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A

court "must resolve all ambiguities and draw all reasonable inferences" in favor of the non-moving party. *Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001).

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505). At this point, the non-moving party may not "rest upon ... mere allegations or denials" of the moving party's pleading. Fed.R.Civ.P. 56(e). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir.1999).

[1] "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994). A court "should examine the record as a whole, just as a jury would, to determine whether a jury should reasonably find an invidious discriminatory purpose on the part of an employer." *Byrnie v. Town of Cromwell,* 243 F.3d 93, 101 (2d Cir.2001).

## III. Analysis

### A. Title VII Claims of Race and National Origin Discrimination Failure to Hire

█ Plaintiff's claim that Defendant failed to hire him as a nursing assistant on

---

6. Plaintiff stated he had "back problem, neck problem ... I couldn't move too much. I

was in therapy for about six months." Dorrilus Dep. at 66.

June 28, 1995 is time-barred. Plaintiff's Opposition at 6. Plaintiff filed his EEOC Charge on July 29, 1997. Acts or events that occurred before October 3, 1996, such as those related to Plaintiff's hiring, are time-barred. *See Commodari v. Long Island Univ.*, 89 F.Supp.2d 353, 369 (E.D.N.Y.2000) (citing 42 U.S.C. § 2000e–5(e)(1) (1994)); *Harris v. City of New York*, 186 F.3d 243, 247 n. 2 (2d Cir.1999) ("An aggrieved employee has 300 days from the time when he or she knew or should have known of an adverse employment decision to file a charge of discrimination with the EEOC."); *see also National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, ——, 122 S.Ct. 2061, 2072, 153 L.Ed.2d 106 (2002) ("[d]iscrete discriminatory acts are not actionable if time barred, even when related to acts alleged in timely filed charges.").[7]

**November 21, 1996 Suspension**

■ To state a *prima facie* case of discrimination, Plaintiff must establish that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action took place under circumstances that give rise to an inference of unlawful discrimination. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 311–12 (2d Cir.1997). "[A] plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is 'minimal.'" *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir.2002) (citation omitted).

■ Plaintiff appears to establish a prima facie case of discrimination with respect to his suspension on November 21, 1996. The first and third elements are satisfied, as Plaintiff is a member of a protected class (African–American and Haitian) and the three day suspension, though short in duration, constitutes an adverse employment action. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir.2001) ("suspension without pay is sufficient to constitute an adverse employment action").

With respect to the second element, it is at least arguable that Plaintiff demonstrates that he was qualified for his position and performed his job satisfactorily, although, as noted, he had on the job problems. Plaintiff repeatedly met with management regarding his difficulty in "doing the work that he was assigned," Denise Dep. at 111–12, and his alleged insubordinate behavior. *Id.; see also* October 24 Meeting Memo. At the same time, on November 8, 1996, Sister de Paul recommended Plaintiff for a nursing assistant position at the Health and Human Services Employment Center ("HHSEC"), *see* Letter written by Sister de Paul to HHSEC dated November 8, 1996 ("November 8, 1996 Letter").

With respect to the fourth element, Plaintiff's allegations that Gonzalez referred to Plaintiff as "El Negro" and stated that "he hates black people" may, prima facie, suggest an inference of discrimination. Complaint ¶ 11. While the evidence is here isolated and scant, a suggestion of discrimination may arise from derogatory comments or "invidious comments about others in [Plaintiff's] protected group," *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994), or from "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," *Chertkova v. Connecticut*

---

7. Defendant also contends that "no person was hired for the position of nursing assistant during the entire period that Mr. Dorrilus was employed at St. Rose's Home." Def. SOF ¶ 10.

*General Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir.1996).

■ Of greatest significance here, Defendant has offered legitimate, non-discriminatory reasons for suspending Plaintiff, namely "(1) insubordination, (2) verbal threat and abusive language to Supervisor, and (3) inability to fulfill work assignments." Suspension Order dated November 21, 1996, Ex. T to O'Connor Aff. These overcome Plaintiff's (tenuous) prima facie case and Plaintiff provides virtually no evidence "to demonstrate that [Defendant's] articulated reason[s] for its decision [were] in fact a pretext for discrimination." *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir.1997). Plaintiff has not shown, for example, that a "similarly situated individual not in [Plaintiff's] protected group . . . was treated differently," *Tramble v. Columbia Univ.*, 1999 WL 61826, at *5 (S.D.N.Y. Feb. 10, 1999).

**Disparate Pay**

[6] To establish a prima facie case of discriminatory disparate pay, a plaintiff must show: (1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus. *See Belfi v. Prendergast*, 191 F.3d 129, 140 (2d Cir.1999).

■ Plaintiff does not establish a prima facie case of discriminatory disparate pay. While there is no dispute over the first element, with respect to the second element, Plaintiff produces little or no evidence that he was paid less than others who were similarly situated and not members of his protected class. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir.2001) (a valid comparison between employees can only be made if they shared "sufficient employment characteristics . . . so that they could be considered similarly situated."). Rather, Plaintiff claims unpersuasively that the maintenance staff, as a whole, were not paid as well as the nursing assistants. *See* Plaintiff's Opposition at 3 ("The Hispanic maintenance and housekeeping departments are at the bottom of the hierarchy. . . . Employees in these departments were hired and paid the lowest wages of all of the Defendant's . . . employees."). "Title VII does not address, however, how private companies elect to set the pay scale for different positions." *Lee v. Overseas Shipholding Group, Inc.*, No. 00 Civ. 9682, 2001 WL 849747, at *6 (S.D.N.Y. July 30, 2001).

Plaintiff also alleges, with respect to the second element, that he "was paid at the wage of a maintenance employee while St. Rose used his nursing assistant training." Complaint ¶ 9. According to Sister de Paul, nursing assistants, among other things, "physically handle people, lift and transfer, . . . give bed bath[s], [and] assist[ ] people in shower and tubs." Deposition of Sister Mary de Paul Mullen dated October 29, 1999 ("Sister de Paul Dep.") at 56–57. Plaintiff's responsibilities at St. Rose's, on the other hand, were to "mop[ ], buff[ ], and move furniture" on the third and fourth floors, "assist in taking out garbage and cardboard [, and] assist when necessary if someone [was] out sick or day off." Plaintiff's Job Description, Ex. A to Plaintiff's Opposition. "During times of low nursing staff due to inclement weather, [Plaintiff] assisted with some of the details of patient care."[8] November 8, 1996 Letter. That Plaintiff assisted, on

---

8. Sister de Paul testified that when she wrote that Plaintiff had assisted with some details of patient care, she "was referring to the patient's trays being passed out and opened to eat" and that Plaintiff "was able to do some things because . . . his father was a patient with us." Sister de Paul Dep. at 34.

occasion, with patient care does not establish that he is similarly situated to the nursing assistants. *See Conigliaro v. Horace Mann Sch.*, 2000 WL 45439, at *8 (S.D.N.Y. Jan. 19, 2000) ("the performance of some common tasks does not make jobs substantially equal when material differences also exist"); *see also Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir.1997) (individuals being compared "must be similarly situated in all material respects"); *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1547 (S.D.N.Y.1986) ("Employees are not 'similarly situated' merely because their conduct might be analogized.").

With respect to the third element, Plaintiff claims (also unpersuasively) that "Defendant St. Rose hires and make classifications on the basis of race assigning non-whites to lower paying less desirable classifications such as maintenance, while reserving for whites the higher paying more desirable classifications such as nursing assistant, office workers, etc." Plaintiff's Opposition at 11. "[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996). Moreover, Plaintiff's allegation is plainly contradicted by the record. For example, while Plaintiff was working at St. Rose's, six of the thirteen members of the nursing department were non-white, and four (of those six) were black. *See* Nursing Department Chart, Ex. D to Plaintiff's Opposition.

### Hostile Work Environment

To establish a hostile environment claim, a plaintiff must demonstrate that (1) "the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and (2) "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996) (citation omitted). "The conduct alleged must be severe and pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citing *Harris*, 510 U.S. at 22, 114 S.Ct. 367).

Plaintiff fails to establish a prima facie case of a hostile work environment. With respect to the first element, Plaintiff argues that Gonzalez gave him "additional work assignments that were not within his job description and which were not given to other employees," and spoke to him "differently than to the other workers." Plaintiff's Opposition at 3, 7; Dorrilus Dep. at 117 ("[Gonzalez] never sent anybody else to do the floors [Plaintiff's job], but kept sending me to do the other employees' jobs additional to my job."). Gonzalez's alleged references to Plaintiff as "hey you" or "El Negro" "intimidat[ed] [Plaintiff] and [made] him feel inferior, and undermine[d] his word and credibility." Plaintiff's Opposition at 8. And, on November 6, 1996, Plaintiff asserts, Gonzalez stated that "he hated black people." Dorrilus Dep. at 95.

Plaintiff's allegations must be evaluated "to determine whether a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." *Richardson v. New York State Dep't of Correctional Svc.*, 180 F.3d 426, 436 (2d Cir.1999). "[D]etermining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circum-

stances." *Cruz v. Coach Stores*, 202 F.3d 560, 570 (2d Cir.2000). Factors to be considered include "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance;' (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Richardson*, 180 F.3d at 437 (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367.).

With respect to the first factor, Plaintiff has not established that Gonzalez (often) made discriminatory references to Plaintiff. While his Complaint claims that he "was always referred to as 'El Negro' or 'Hey you'", Complaint ¶ 15, his deposition is different. Dorrilus Dep. at 94 ("Mr. Gonzalez treated me different than the other coworkers" on "11/7/96, 11/8/96, 11/20/96 and 11/21/96" by "call[ing] me hey you El Negro"). Plaintiff "ha[s] not offered sufficient facts for any reasonable jury to begin to gauge how frequently the allegedly discriminatory conduct occurred." *Griffin v. Ambika Corp.*, 103 F.Supp.2d 297, 314 (S.D.N.Y.2000). *See also Quiros v. Ciba–Geigy Corp.*, 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (dismissing hostile environment claims when plaintiff "offers only conclusory statements of alleged discrimination and has failed to identify when, where, and/or how often he was [called name] by [his supervisor]").

With respect to the second factor, the severity of the incidents alleged by Plaintiff does not rise to the level of a hostile work environment. First, Defendant's alleged references to Plaintiff as "hey you", at most impolite, lack discriminatory overtones. *See Griffin*, 103 F.Supp.2d at 314 ("[U]se of the phrase[ ] ... 'you people' cannot be deemed inherently racially offensive without greater specificity as to the context of [its] usage."). Second, referring to Plaintiff as "El Negro," which understandably may have "engendered offensive feelings [in Plaintiff] ... does not significantly affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. *See Schwapp*, 118 F.3d at 110 (" '[I]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.' ") (citation omitted); *Wilson v. Consol. Edison Co. of N.Y.*, No. 96 Civ. 7546, 2000 WL 335733, at *6 (S.D.N.Y. Mar. 30, 2000) ("Allegations of isolated encounters that were not definitively discriminatory do not amount to severe and pervasive conduct."). Third, Gonzalez's remark that "he hates black people" was, assuming its truthfulness, an isolated comment.[9] Dorrilus Dep. at 95. "Casual comments, or accidental or sporadic conversation, will not trigger [ ]relief pursuant to [Title VII]." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986).

Plaintiff does not allege that he was physically threatened, nor does he provide any "concrete or expert evidence of psychological harm or witnesses to the alleged incidents that could attest to [his] level of humiliation." *Griffin*, 103 F.Supp.2d at 314. Looking at the totality of the circumstances, the alleged harassment is not "of such quality or quantity that a reasonable employee would find the conditions of [his] employment altered for the worse." *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997).

## IV. Conclusion and Order

For the foregoing reasons, the Court grants Defendant's motion for summary judgment. The Clerk is respectfully requested to close this case.

---

9. *See supra* nn. 330–331.